IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 31, 2019 Session Heard at Nashville

**BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME
COURT OF TENNESSEE v. LORING EDWIN JUSTICE**

**Direct Appeal from the Chancery Court for Knox County
No. 189578-1, 189418-3     Robert E. Lee Davies, Senior Judge**

_____

**No. E2017-01334-SC-R3-BP**

_____

This lawyer-disciplinary proceeding stems from a Knoxville attorney's conduct in a federal personal injury lawsuit where the attorney represented the plaintiff. The federal district court imposed a discovery sanction against the corporate defendant and ordered it to pay the attorney's fees and costs the plaintiff had incurred in locating and deposing a witness the corporate defendant failed to disclose. When the plaintiff's lawyer submitted an itemization of fees and costs to the federal district court, the lawyer falsely claimed as his own work the work that a paralegal had performed. The lawyer also submitted a written declaration along with the itemization falsely claiming that he had kept contemporaneous records of his time in the case and attesting to the truth and accuracy of the itemization. The lawyer also requested in the itemization "grossly exaggerated and unreasonable" attorney's fees of more than $103,000 for work beyond the scope of the federal district court's order. Later, the lawyer testified falsely in a hearing before the federal district court by reaffirming the truth and accuracy of the itemization and the written declaration. A Hearing Panel of the Board of Professional Responsibility ("Hearing Panel") determined that the lawyer had violated four provisions of the Tennessee Rules of Professional Conduct ("RPC")—RPC 1.5(a) (Fees); RPC 3.3(a) (Candor Toward the Tribunal); RPC 3.4(b) (Fairness to Opposing Party and Counsel); and RPC 8.4(a) and (c) (Misconduct). The Hearing Panel found six aggravating and two mitigating factors and sanctioned the lawyer with a one-year active suspension and twelve additional hours of ethics continuing legal education. The Board of Professional Responsibility ("Board") and the lawyer appealed to the Chancery Court for Knox County. Tenn. Sup. Ct. R. 9, § 1.3. The trial court affirmed the Hearing Panel's findings of fact and conclusions of law but modified the sanction to disbarment. The trial court concluded that Standard 5.11 of the ABA Standards for Imposing Lawyer Sanctions ("ABA Standards"), which identifies disbarment as the presumptive sanction, applies and

that the aggravating and mitigating factors do not warrant a lesser sanction than disbarment. The lawyer appealed, and after carefully reviewing the record and applicable authorities, we affirm the trial court's judgment in all respects, including its modification of the sanction to disbarment.

**Tenn. Sup. Ct. R. 9, § 1.3 (currently Tenn. Sup. Ct. R. 9, § 33.1(d)) Direct Appeal; Judgment of the Trial Court Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Linn Guerrero, Knoxville, Tennessee, for the appellant, Loring E. Justice.

Gerald Morgan and William C. Moody, Nashville, Tennessee, for the appellee, Board of Professional Responsibility.

**OPINION**

**I. Factual and Procedural Background**

*A. Hearing Panel Proof*

Loring Edwin Justice grew up in Oak Ridge, Tennessee, obtained his undergraduate degree in 1995 from the University of Tennessee, and in 1998, graduated from Yale University School of Law. That same year he obtained his license to practice law in Tennessee, and from 1998-1999, Mr. Justice worked as a judicial law clerk for a judge of the United States Court of Appeals for the Sixth Circuit. After working the next year as an associate at a Nashville law firm, in 2000, Mr. Justice returned to East Tennessee and founded Loring Justice PLLC ("the law firm"), where he has practiced ever since.

From May to September 2009, Mr. Benjamin Kerschberg worked for the law firm. Mr. Justice and Mr. Kerschberg met while they were both students at Yale Law School. They remained friends after law school and both served as judicial clerks for the same federal circuit court judge. Mr. Kerschberg did not obtain his Tennessee law license, so he worked as a contract paralegal for the law firm, and he billed the law firm for his services by submitting invoices with narrative entries describing the tasks performed, the date the services were rendered, and the time he spent on the tasks, in quarter-hour increments.

During the time Mr. Kerschberg worked for the law firm, Mr. Justice represented Scotty Thomas in a personal injury lawsuit ("the Thomas case") in the United States District Court for the Eastern District of Tennessee ("District Court") against Lowe's Home Centers ("Lowe's"). Mr. Thomas alleged that, on June 21, 2005, while he was working for a merchandising company inside a Lowe's store near Knoxville, a large stack of metal roofing sheets collapsed on top of him, causing very serious injuries, including brain damage. Lowe's denied liability and also denied having any knowledge or records showing that the incident occurred or that the merchandising company was in the Lowe's store on the date of the alleged incident.

Mr. Thomas recalled a female Lowe's employee assisting him after the incident, however, so during discovery Mr. Justice repeatedly asked Lowe's to identify this employee. Lowe's failed to disclose this employee's name, even though she was a human resources manager for Lowe's, was onsite at the Lowe's store the day the incident allegedly occurred, and made an appointment for Mr. Thomas at a health clinic the day of the incident. In July 2010, Mr. Justice learned her identity from a medical record he obtained by subpoena from the health clinic where Mr. Thomas was first treated for his injuries.

By this time, Mr. Justice had already moved for a default judgment based on Lowe's discovery violations. The District Court held the motion in abeyance until December 1, 2010, and then referred it to a federal magistrate judge, who concluded that Lowe's had failed to satisfy its discovery obligations and that "the Plaintiff should be compensated for the labor and costs incurred in finding [the witness], because these costs were necessitated by [Lowe's] failure to properly investigate the allegations of this suit." The magistrate judge also recommended that Lowe's "be required to pay all reasonable fees and expenses incurred in locating and deposing [the witness], including attorneys' fees, transcription costs, court reporter fees, and other costs" and that Mr. Justice be required "to file an affidavit and/or documentation evidencing the fees, expenses, and costs incurred."

On March 15, 2011, the District Court adopted in part the magistrate judge's recommendations.[1] The District Court required Lowe's to "pay Plaintiff [Mr. Thomas] all reasonable attorney's fees and expenses incurred in locating and deposing [the witness], including attorney's fees, transcription costs, court reporter fees, and other costs" and required Mr. Justice to provide the District Court by April 8, 2011, "documentation evidencing the fees, expenses, and costs incurred, associated with the discovery of [the witness]." The District Court gave Lowe's fourteen days thereafter "to

---

[1] The District Court did not accept the magistrate's recommendation to bar Lowe's from presenting evidence at the trial that would dispute Mr. Thomas's version of how the accident occurred.

file objections to the reasonableness of the fees and costs requested," after which the District Court would determine "the final amount of the monetary sanctions."

Mr. Justice submitted a preliminary itemization by the initial deadline but obtained an extension of time and submitted the final itemization and fee petition ("Itemization") to the District Court on April 22, 2011. The Itemization included 288 entries for work and expenses incurred from January 9, 2009 to April 8, 2011, listed 371.5 hours of work attributed to three lawyers and four assistants, and sought $106,302.00, which included more than $103,000 in attorney's fees. Of the attorney hours, 325.5 were attributed to Mr. Justice and billed at the rate of $300 per hour. Only eleven hours were attributed to Mr. Kerschberg and billed at the rate of $90 per hour. Along with the Itemization, Mr. Justice submitted a written declaration attesting under penalty of perjury that he had maintained contemporaneous records of the work performed on the Thomas case and that the Itemization was true and correct.

Questions were raised in the District Court about the Itemization, in part because several of the narrative entries purporting to describe Mr. Justice's work were identical, or nearly identical, to entries in the invoices Mr. Kerschberg had submitted to Mr. Justice's law firm from May to September 2009 describing Mr. Kerschberg's work.

At a hearing in the District Court on February 17, 2012, Mr. Justice testified at length, as did several other witnesses. Upon considering the proof, the District Court suspended Mr. Justice from practicing law in the District Court for six months.[2] Mr. Justice appealed his suspension, but the United States Court of Appeals for the Sixth Circuit affirmed, and the United States Supreme Court denied his petition for writ of certiorari.

While the federal proceedings were pending, a lawyer with whom Mr. Kerschberg had discussed the matter reported it to the Board. At Mr. Justice's request, the Board held its investigation in abeyance pending disposition of some of the federal proceedings. Eventually, the Board completed its investigation and filed a petition for discipline against Mr. Justice on September 25, 2013.[3] The Board alleged that Mr. Justice had violated RPC 1.5(a) (Fees), RPC 3.3(a)(1) (Candor Toward the Tribunal), RPC 3.4(b) (Fairness to Opposing Party and Counsel), and RPC 8.4(a), (b), (c), and (d) (Misconduct).

---

[2] The District Court never awarded any attorney's fees and costs for Lowe's discovery violation.

[3] This Court revised Tennessee Supreme Court Rule 9 effective January 1, 2014. This disciplinary proceeding, however, was initiated prior to January 1, 2014, and it is therefore governed by the prior version of the rule. See Garland v. Board of Professional Responsibility, 536 S.W.3d 811, 816 (Tenn. 2017). Any references herein are to the pre-2014 version of Rule 9.

The Hearing Panel convened from January 20-23, 2015. The Board presented no live witnesses. As for its claim that Mr. Justice violated RPC 1.5(a) by charging an unreasonable attorney fee, the Board presented the District Court's order and Mr. Justice's Itemization. The Board asserted that many of the entries in the Itemization were for work completely unrelated to locating and deposing the witness, such as: (1) attending the Tennessee Rule of Civil Procedure 26(f) discovery conference; (2) preparing the initial written discovery; (3) preparing an amended complaint; (4) meeting with his client; (5) reading hotel reservations; (6) researching electronic filing rules; (7) talking with the clerk's office about electronic filings; (8) practicing a motion argument in front of his paralegal; (9) locating an expert witness; and (10) workshopping the case at the American Association for Justice Deposition College.

The Board also introduced Mr. Kerschberg's deposition upon written questions, his 2009 invoices, and excerpts of his former testimony in the District Court to establish that Mr. Justice had claimed Mr. Kerschberg's work as his own. In his deposition and in his testimony in the District Court, Mr. Kerschberg stated that he had personally performed the work described in his invoices, that Mr. Justice had paid the invoices without question, and that he had no knowledge of Mr. Justice ever recording his own time on the Thomas case or on any other case. Mr. Kerschberg recognized the possibility that Mr. Justice could have done work on the Thomas case without his knowledge that was similar to his own, and he acknowledged using Mr. Justice's notes on occasion to describe his own work in the narrative invoice entries. But Mr. Kerschberg consistently testified that the narrative invoice entries described his own work, not Mr. Justice's work, and maintained that, to his knowledge, Mr. Justice had never kept time on the Thomas case or any other case.

The Board emphasized as well that seventeen Itemization entries were virtually identical to entries in Mr. Kerschberg's invoices in terms of the dates, descriptions of the work, and time necessary to perform the tasks.[4] A side-by-side comparison of the Itemization and invoice entries appears below.

    a.    **June 13, 2009**
        Kerschberg
        1.25   Revision of Motion to Have Requests for Admission Deemed Admitted.

---

[4] Mr. Kerschberg recorded his time in quarter hour increments and used the initials "LJ" or "Loring" to refer to Mr. Justice. Mr. Justice recorded his time in tenth of an hour increments.

Justice
1.2    Revision of Motion to Have Requests for Admission Deemed Admitted

**b.    June 14, 2009**
Kerschberg
2.25    Added Loring edits to Motion to Deem Requests for Admissions admitted.   Added section about Letter to Clint Woodfin and Motion to Supplement.    Researched electronic filing rules for the E.D. Tenn. Researched proper procedure for filing Amended Complaint (Local Rules; Scheduling Order; FRCP).

Justice
2.2    Edits to Motion to Deem Requests for Admissions admitted.  Added section about Letter to Clint Woodfin and Motion to Supplement. Researched electronic filing rules for the E.D. Tenn.

**c.    June 16, 2009**
Kerschberg
2.5    All final preparations of Amended Complaint and Motion to Deem Requests For Admissions Deemed Admitted.   Preparation of all PDF exhibits.  Compilations of files.  Filing with E.D. Tenn. via ECF.  Hard copies of everything for file.

Justice
2.5    All final preparations of Amended Complaint and Motion to Deem Requests for Admissions Deemed Admitted.   Preparation of all PDF exhibits.  Compilation of files.  Filing with E.D. Tenn. via ECF.  Hard copies of everything for file.

**d.    June 16, 2009**
Kerschberg
3.0    Edited Motion to Compel Discovery and Memorandum In Support thereof prepared by Juliane Moore.

Justice
3.0    Preparation and editing of Motion to Compel Discovery and Memorandum In Support partially prepared by legal assistant

**e.     June 17, 2009**

Kerschberg

1.0     Talked to Angela Brush at district court to correct misunderstandings re our filings.  Second conversation with LJ about Consent Motion To Amend with Clint Woodfin. Drafted Consent Motion for review by Clint Woodfin.

Justice

1.0     Talked to Angela Brush at district court to correct misunderstandings re our filings

**f.     June 17, 2009**

Kerschberg

4.0     Continued to revise and rewrite Motion to Compel Discovery.

Justice

4.0     Continued to research, revise and rewrite Motion to Compel Discovery

**g.     June 18, 2009**

Kerschberg

4.5     Motion to Compel Discovery.

Justice

4.5     Continued research, revision and refinement of Motion to Compel Discovery

**h.     June 19, 2009**

Kerschberg

.5     Letter to Bob Davies regarding additional materials needed from MSG.

Justice

.5     Letter to Bob Davies regarding additional materials needed from MSG about the project

**i.     July 16, 2009**

Kerschberg

.25     Reviewed Loring's notes from meeting with Clint Woodfina [sic] and calendared follow-up call to Cory re:  Clint's call.

Justice

.2	Reviewed notes from meeting with Clint Woodfin and calendared follow-up call to Cory Kitchen re: Clint's call

**j.	July 22, 2009**
Kerschberg

5.0	Drafted and typed memo for trip to Alabama.

Justice

5.0	Drafted and typed memo for trip to Florence, Alabama to meet with Plaintiff's MSG co-workers. This memo summarized the liability issues in the case and listed important questions to ask to try to understand whether it was plausible Lowe's could lack notice and to prove Lowe's indeed had notice and to gain physical descriptions of individuals of interest

**k.	July 27, 2009**
Kerschberg

4.5	Reviewed all notes from our trip to Alabama and compiled Master To-Do List for Loring and BG. Drafted Affidavits of Kitchen, Yeates, and McBride. Online research re: Teresa Beavers (Lowe's Manager).

Justice

4.5	Reviewed all notes from our trip to Alabama to meet with the MSG witnesses and compiled Master To-Do List. Drafted Affidavits of Kitchen, Yeates, and McBride. Online research re: Teresa Beavers (Lowe's Manager)[5]

**l.	July 29, 2009**
Kerschberg

.25	Revisions of Affidavits of Kitchen, Yeates, and McBride.

Justice

.2	Revisions of Affidavits of Kitchen, Yeates, and McBride

---

[5] The Board also introduced an entry from Mr. Justice's preliminary Itemization in which Mr. Justice referred to himself in the third person as "Loring." This entry stated in relevant part, "Reviewed all notes from our trip to Alabama to meet with the MSG witnesses and *compiled Master To-Do List for Loring* and B. Griffith, summer clerk." The Board alleged that this reference resulted from Mr. Justice copying Mr. Kerschberg's invoice. This third-person reference was omitted from Mr. Justice's final Itemization.

**m.   August 8, 2009**

<u>Kerschberg</u>

4.0    Coordinated with Debi Dean to make sure that Randy, Bradley and Corey will sign Affidavits and get them back to us notarized. Prepared final versions with LJ edits. Two versions for Bradley and Cory—one with and one without Teresa Beavers. Researched FRCP and EDTN Rules re: timeliness of Notice of Filing with respect to Hearing Date. Drafted Notice of Filing. Drafted Memorandum to accompany Notice of Filing for filing with the court this week.

<u>Justice</u>

3.0    Coordinated with Debi Dean of Alabama Head Injury Foundation to make sure that Randy, Bradley, and Corey will sign Affidavits and get them back to us notarized. Reviewed legal assistant's research of FRCP and EDTN Rules re: timeliness of Notice of Filing with respect to Hearing Date. Drafted Notice of Filing. Drafted Memorandum to accompany Notice of Filing for filing with the court this week.

**n.   August 10, 2009**

<u>Kerschberg</u>

.5    Coordination of all Affidavit signings, etc. with Debi Dean.

<u>Justice</u>

.5    Coordination of all Affidavit signings, etc. with Debi Dean

**o.   August 27, 2009**

<u>Kerschberg</u>

5.0    Reviewed file and all FRCP related to discovery to look at options and obligations for supplementation before the September 14 hearing, as well as the possibility of fee shifting.

<u>Justice</u>

5.0    Reviewed file and all FRCP related to discovery to look at options and obligations for supplementation before the September 14 hearing, as well as the possibility of fee shifting and sanctions

**p.   August 31, 2009**

<u>Kerschberg</u>

2.0    Prepared outline for Loring as to action plan before September 14 hearing. Researched Lowe's Loss/Safety Prevention Manager. Drafted proposed Interrogatory re: iinformation [sic] on who held that position at

the time of the accident. Revised and prepared cover letters to Clint Woodfin and Clerk's office.

Justice
2.0     Prepared outline as to action plan before September 14 hearing. Researched Lowe's Loss/Safety Prevention Manager. Drafted proposed Interrogatory re: information on who held that position at the time of the accident. Revised and prepared cover letters to Clint Woodfin and Clerk's office

q.     **September 9, 2009**
Kerschberg
1.25    Reviewed our initial disclosures and discovery responses to see what needs to be supplemented. Reviewed all supplemental materials provided by Clint Woodfin. Detailed email to Loring reviewing thoughts on the supplemental documents and possible RFPs. Google search for the two other female managers mentioned by Clint Woodfin. Results in email to LJ. Email to Mike Conley on Listserv re: obtaining the good information he has re falling products litigation.

Justice
1.2     Detailed email to file and staff after reviewing supplemental documents of defendant and possible RFPs. Google search for the two other female managers mentioned by Clint Woodfin.

The Board additionally offered into evidence an April 11, 2011 email by which Mr. Justice transmitted the initial Itemization to Mr. Kerschberg for review.[6] This email stated:

> Thanks for the email Kersch. I billed a lot of time for my reading your work rather than you doing it so you won't have to testify if it comes to that. Hope you are not mad about that. I really appreciate you. Tell me what you think of this. What a war.

The Board pointed out that the Itemization did not include a single entry for time Mr. Justice spent "reading" Mr. Kerschberg's work.

---

[6] The record does not support Mr. Justice's assertion that this e-mail was marked for identification but not received into evidence.

By agreement, the Board and Mr. Justice introduced excerpts of Mr. Justice's former testimony from the District Court hearing. The Board presented Mr. Justice's testimony denying that he had wrongly attributed Mr. Kerschberg's work to himself in the Itemization, reaffirming the accuracy of the Itemization, and maintaining that he had contemporaneously recorded the time he spent working on the federal case. The Board also introduced the written declaration Mr. Justice had submitted along with the Itemization, in which he reaffirmed that he had performed the work claimed in the Itemization, that he had contemporaneously recorded his time for the work claimed in the Itemization, and that the Itemization was true and accurate—all claims that the Board alleged were false.

When the Board closed its proof, Mr. Justice moved for involuntary dismissal, but the Hearing Panel denied his motion. Mr. Justice then presented his proof, which consisted of written exhibits, including excerpts of testimony given in the District Court hearing, as well as the in-person testimony of Chad Rickman, an associate with Mr. Justice's law firm, and Mr. Justice's own in-person testimony.

Mr. Rickman testified that the law firm is contingency-fee based, does not have a billing system, and does not typically require employees and lawyers to record time. Mr. Rickman did not work at the law firm when Mr. Kerschberg worked there and first worked on the Thomas case in July 2010. But, Mr. Rickman recalled Mr. Justice instructing all law firm employees and lawyers to record their time on the Thomas case. Mr. Rickman had recorded his time either on handwritten notes or in emails. Clerical staff used the notes and emails to enter his time into a Word document that included the time of all law firm personnel on the Thomas case. As an example of his own time records, Mr. Rickman produced an April 2011 email reporting his time. But this email was sent after the District Court filed its order awarding the discovery sanction, and Mr. Rickman could not produce any email or note predating the District Court's order by which he had reported time on the Thomas case.

As for the Word document containing all of the time records for personnel of the law firm on the Thomas case, Mr. Rickman stated that it became the Itemization that Mr. Justice filed in the District Court. But Mr. Rickman had not seen the Word document in any format other than the Itemization, and he had first seen the Itemization only after the District Court awarded the discovery sanction.

Mr. Rickman acknowledged that he had reviewed the Itemization before it was filed to eliminate confidential work product and to ensure that the entries were appropriate and not duplicative. But Mr. Rickman neither reviewed Mr. Kerschberg's invoices nor compared the Itemization to any other time records. As for the scope of the Itemization, Mr. Rickman disagreed with the Board's assertion that the Itemization sought unreasonable fees by listing tasks that were beyond the scope of the District

- 11 -

Court's order. Mr. Rickman, like Mr. Justice, interpreted the District Court's order as awarding "all fees and expenses associated with all the extra work that had to be done since the initial disclosure because of Lowe's discovery abuse." Mr. Rickman said that he and Mr. Justice never really considered interpreting the District Court's order narrowly as authorizing only fees associated with finding and deposing the witness because that interpretation "seemed pretty inconsistent with what the [magistrate judge] and [the District Court] had said." Mr. Rickman maintained that Mr. Justice had intended to give any monetary sanction awarded to Mr. Thomas. Mr. Rickman believed that federal law generally requires paying discovery sanctions to clients, and he interpreted the District Court's order as requiring Lowe's to pay the sanction to Mr. Thomas.

In general, both in the District Court and before the Hearing Panel, Mr. Justice testified consistently with Mr. Rickman. Mr. Justice agreed, for example, that ordinarily neither he nor anyone else at the law firm records time. Mr. Justice said that the Thomas case was the exception and that he began keeping contemporaneous time records on the Thomas case and requiring all other law firm personnel to do so around the discovery conference on December 10, 2008, because he believed Lowe's blanket denials would eventually result in a discovery sanction. Mr. Justice stated that he recorded his own time either by personally entering it into the Word document or by giving clerical staff his handwritten time records to enter into the Word document. But Mr. Justice was unable to produce any handwritten note or email recording his own time on the Thomas case, and he could not recall the name of the Word document. Like Mr. Rickman, Mr. Justice said that all time records on the Thomas case were entered into the Word document. He explained that the Word document was either emailed around the law office or saved to portable drives and copied to various law firm computers for various personnel to enter time. He testified that the Word document had been overwritten each time data was entered and that earlier versions of the document had not been saved. According to Mr. Justice, the Word document eventually became the Itemization that was filed in the District Court.

Mr. Justice attempted to locate earlier versions of the Word document after questions were raised about the Itemization in the District Court. He had instructed the law firm's in-house technology staff to search for earlier versions of it. He also engaged an outside computer consultant to search the law firm's computers for earlier versions of the Word document. Eventually, four versions of the Word document were located, but none predates the District Court's order awarding the discovery sanction.

Mr. Justice opined that no earlier version of the Word document was located because it was overwritten each time data was entered and because the law firm computers used a "defragmenting" process. According to Mr. Justice, this process made it difficult or impossible to recover earlier versions of Word documents. Mr. Justice said that he had turned off this process after the Itemization was questioned in the District

Court.  Mr. Rickman corroborated Mr. Justice's testimony on this point, saying that he remembered Mr. Justice frantically going to each computer in the office to turn off the defragmenting process.

Concerning the seventeen Itemization entries, Mr. Justice denied copying Mr. Kerschberg's invoices and again maintained, as he had in the District Court, that he had personally performed the work described in the Itemization and that he had contemporaneously recorded his time, meaning within seven-to-ten days of completing the work.  Mr. Justice offered various explanations for the similarities between his Itemization entries and Mr. Kerschberg's invoice entries.  He posited that Mr. Kerschberg may have copied his notes when creating the invoice entries, and, as support for this theory, pointed to Mr. Kerschberg's acknowledgment that he had occasionally used Mr. Justice's notes to create his own invoice entries.  Mr. Justice speculated that law firm personnel, including Mr. Rickman, may have mistakenly entered or incorrectly assigned time when preparing the Itemization.  Mr. Justice also implied that Mr. Kerschberg may have gained unauthorized access to the firm's computers and manipulated the Itemization.  To support this suggestion, Mr. Justice described Mr. Kerschberg's father as a nationally known computer expert and said that the law firm's technology staff had discovered oddities in the law firm's computer system during the federal proceedings, including the forwarding of emails from Mr. Kerschberg's deactivated account to another email address associated with Mr. Kerschberg.

Mr. Justice emphasized as well that, although he had not copied Mr. Kerschberg's invoice entries, doing so would not have been improper because he had actually performed the tasks described in the Itemization entries.  Mr. Justice reaffirmed the truth and accuracy of the Itemization and his assertion that he and Mr. Kerschberg had performed the same or similar work (including clerical tasks), on the same date, and for exactly, or almost exactly, the same amount of time.

Mr. Justice agreed that the law firm had paid Mr. Kerschberg in 2009 without questioning the charges or the entries describing his work.  When asked by the Hearing Panel to review Mr. Kerschberg's invoices and point out errors, Mr. Justice identified only typos and misnomers and nothing substantial.  When asked the meaning of his April 11, 2011 email to Mr. Kerschberg stating that he had billed "a lot of time" for "reading" Mr. Kerschberg's work, Mr. Justice explained that this statement merely reflected the "<u>Chamberlain</u>" principle that he had followed when preparing the Itemization.  Mr. Justice said that, under this <u>Chamberlain</u> principle, which he purportedly derived from <u>Chamberlain Mfg. Corp. v. Maremont Corp.</u>, 92-C-0356, 1995 WL 769782, at 1 (N.D. Ill. Dec. 29, 1995), any duplicative work he and Mr. Kerschberg performed could be

billed at the higher attorney rate.[7] By ascribing this meaning to the email, Mr. Justice also implicitly answered the question of why the Itemization had not included any entries for Mr. Justice "reading" Mr. Kerschberg's work.

With respect to the Board's assertion that the Itemization sought unreasonable fees for tasks far exceeding the scope of the District Court's order, Mr. Justice asserted that the Lowe's discovery violation had impacted the entire case, causing much more work than otherwise would have been necessary. Mr. Justice maintained that the Itemization had been conservative and had included only a portion of the time for the extra work necessitated by Lowe's discovery violation. As did Mr. Rickman, Mr. Justice interpreted the District Court's order as broader than its literal language and as encompassing fees for any and all extra work stemming from Lowe's discovery violation. Like Mr. Rickman, Mr. Justice stated that federal law requires paying discovery sanctions to clients, and as a result, Mr. Justice claimed that he had no financial incentive to inflate the fees sought by the Itemization. Mr. Justice also claimed that even if he had not been required to do so by federal law, he would have given the sanction to Mr. Thomas because Mr. Thomas needed the money more than the law firm.

## B. Hearing Panel's Decision

At the conclusion of the proof, the Hearing Panel took the matter under advisement and allowed the parties to submit post-hearing proposed findings of fact and conclusions of law. The Hearing Panel issued its twenty-five-page written decision on March 9, 2015. The Hearing Panel concluded that Mr. Justice had violated RPC 1.5(a) (Fees);[8] RPC 3.3(a) (Candor Toward the Tribunal);[9] RPC 3.4(b) (Fairness to Opposing Party and Counsel);[10] and RPC 8.4(a) and (c) (Misconduct).[11] Although the Board's

---

[7] As explained more fully herein, contrary to Mr. Justice's argument, Chamberlain does not stand for the proposition that an attorney can charge a higher rate when duplicating a paralegal's work. 1995 WL 769782, at *9.

[8] "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." Tenn. Sup. Ct. R. 8, RPC 1.5(a).

[9] "A lawyer shall not knowingly make a false statement of fact or law to a tribunal . . . ." Tenn. Sup. Ct. R. 8, RPC 3.3(a)(1).

[10] "A lawyer shall not . . . falsify evidence [or] counsel or assist a witness to offer false or misleading testimony . . . ." Tenn. Sup. Ct. R. 8, RPC 3.4(b).

[11] "It is professional misconduct for a lawyer to (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another"

prehearing brief had listed ABA Standards 5.11 and 6.11,[12] both of which identify disbarment as the applicable presumptive sanction, the Hearing Panel failed to reference any ABA Standard establishing a presumptive sanction. Rather the Hearing Panel discussed aggravating and mitigating factors, found six aggravating and two mitigating factors, and imposed a sanction of one-year active suspension and twelve additional hours of ethics continuing legal education. The Hearing Panel found that:

(1)     Mr. Kerschberg's invoices described work he had done;

(2)     Mr. Justice's testimony that he had worked the time in the seventeen matching entries was not credible, and Mr. Justice's explanations for why the entries were nearly identical were implausible;

(3)     Mr. Justice's April 11, 2011 email to Mr. Kerschberg was actually an acknowledgment that Mr. Justice had claimed time on the Itemization for himself for work Mr. Kerschberg had actually performed, and Mr. Justice's assertion that it merely advised of his use of the Chamberlain principle was implausible;

(4)     The credibility of Mr. Justice's testimony concerning his work was "further called into question by his demeanor on the witness stand" because Hearing Panel questions were "often met with lengthy periods of silence prior to

---

or "(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Tenn. Sup. Ct. R. 8, RPC 8.4(a), (c).

[12] ABA Standard 5.11 provides:

> Disbarment is generally appropriate when:
> a.  a lawyer engages in serious criminal conduct a necessary element of which incudes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft . . . or
>
> b.  a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

ABA Standard 6.11 provides:

> Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

answering the question" and Mr. Justice's answers to Hearing Panel questions about the Itemization were "often evasive;"

(5)     Regarding the seventeen nearly identical entries, Mr. Justice knew he was representing to the District Court that he had performed work that actually had been performed by another;

(6)     By claiming to have performed work performed by Mr. Kerschberg, Mr. Justice gave a false statement under oath;

(7)     Mr. Justice knowingly testified falsely before the District Court by testifying that he worked the time attributed to him in the Itemization and by testifying that he kept a contemporaneous record of his time;

(8)     By claiming in the Itemization to have performed work actually performed by Mr. Kerschberg, Mr. Justice made a false statement of fact to a tribunal in violation of RPC 3.3(a)(1) (Candor Toward the Tribunal);

(9)     By testifying falsely before the District Court that he made no false statements in the Itemization, personally worked the time attributed to him, and kept a contemporaneous record of his time, Mr. Justice made false statements of fact to a tribunal in violation of RPC 3.3(a)(1) (Candor Toward the Tribunal);

(10)    Numerous entries in the Itemization were unrelated to locating and deposing [the witness] and exceeded the scope of the District Court's order;

(11)    By including numerous items that far exceeded the scope of the District Court's order, the fee petition requested an unreasonable fee in violation of RPC 1.5(a);

(12)    By adopting work as his own that was actually performed by Mr. Kerschberg, Mr. Justice falsified evidence in violation of RPC 3.4(b) (Fairness to Opposing Party and Counsel);

(13)    By violating the foregoing ethical rules, Mr. Justice violated RPC 8.4(a) and (c) (Misconduct);

(14)    The proof established the following aggravating factors: (a) a dishonest or selfish motive; (b) a pattern of misconduct; (c) multiple offenses; (d) submission of false evidence; (e) false statements or other deceptive practices during the disciplinary process; (f) refusal to acknowledge

wrongful nature of conduct; and (g) substantial experience in the practice of law;[13]

(15)    The proof established the following two mitigating factors—(a) absence of a prior disciplinary record and (b) the imposition of other penalties or sanctions (the six-month suspension from the practice of law by the District Court);[14]

(16)    The proper sanction, after weighing aggravating and mitigating factors, is a one-year active suspension and twelve additional hours of continuing legal education in ethics.

## C.  Trial Court Proceedings

Both Mr. Justice and the Board appealed from the Hearing Panel's decision. Mr. Justice raised many issues, but the Board argued only that the Hearing Panel erred by suspending rather than disbarring Mr. Justice. The trial court affirmed the Hearing Panel's findings of fact but modified the sanction to disbarment. In doing so, the trial court emphasized that the Hearing Panel had failed to begin its analysis with any ABA Standard that identified the presumptive sanction for the factual circumstances. The trial court determined that ABA Standard 5.11(b), which identifies disbarment as the presumptive sanction, applies in these circumstances.[15] After considering the aggravating and mitigating factors, the trial court imposed the presumptive sanction, finding no basis to impose a lesser sanction. In explaining its decision in an order filed February 2, 2017, the trial court stated:

> This Court is reluctant to impose the sanction of disbarment upon a lawyer with no prior disciplinary offenses. The comments to ABA Standard 5.11 state "in imposing final discipline in such cases, most courts impose disbarment of lawyers who are convicted of serious felonies." However, the intentional deceit by [Mr.] Justice on the opposing party, [and the federal judges], along with the refusal to acknowledge the wrongful nature of his conduct and the total lack of remorse leaves this Court with no alternative.

---

[13] See ABA Standard 9.22.

[14] See ABA Standard 9.32.

[15] The trial court concluded that ABA Standard 6.11 does not apply in these circumstances, although it also identifies disbarment as the presumptive sanction.

Mr. Justice then moved to alter or amend the judgment, challenging, among other things, the trial court's modification of the sanction to disbarment. In a fifteen-page order filed May 31, 2017, the trial court addressed and rejected each of Mr. Justice's claims. With respect to the sanction, the trial court stated:

> Although the Court believed the sanction of disbarment was justified in this case, the Court acknowledges it was reluctant to impose such a severe sanction on Mr. Justice. However, any lingering doubt as to the disbarment of Mr. Justice has been obliterated by his motion to alter or amend. [Mr.] Justice blames everyone and everything for his predicament, other than his own misconduct.

## II. Standard of Review

This Court recently reaffirmed the familiar standard of review that applies in lawyer-disciplinary appeals, stating:

> The Tennessee Supreme Court is the final arbiter of the professional conduct of all lawyers practicing in Tennessee, Sneed v. Bd. of Prof'l Responsibility, 301 S.W.3d 603, 612 (Tenn. 2010), and the source of authority of the Board and all its functions, Long v. Bd. of Prof'l Responsibility, 435 S.W.3d 174, 178 (Tenn. 2014) (citing Brown v. Bd. of Prof'l Responsibility, 29 S.W.3d 445, 449 (Tenn. 2000)). Attorneys charged with disciplinary violations have a right to an evidentiary hearing before a hearing panel, which determines whether a violation has occurred and, if so, the appropriate sanction for the violation. Bd. of Prof'l Responsibility v. Daniel, 549 S.W.3d 90, 99 (Tenn. 2018) (citing Maddux v. Bd. of Prof'l Responsibility, 409 S.W.3d 613, 621 (Tenn. 2013)). Either party dissatisfied with the hearing panel's decision may appeal to the circuit or chancery court, where review is conducted upon "the transcript of the evidence before the hearing panel and its findings and judgment." Tenn. Sup. Ct. R. 9, § 1.3 (currently § 33.1(d)). Either party dissatisfied with the trial court's decision may appeal directly to this Court, which will resolve the appeal based "upon the transcript of the record from the circuit or chancery court, which shall include the transcript of evidence before the hearing panel." Id. This Court applies the same standard of review as the trial court, Daniel, 549 S.W.3d at 100, and determines whether the hearing panel's findings, inferences, conclusions, or decisions are:
>
> > (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by

abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Id. § 1.3 (currently 33.1(b)). In determining whether substantial and material evidence supports a hearing panel's decision, this Court evaluates whether the evidence "furnishes a reasonably sound factual basis for the decision being reviewed." Sneed, 301 S.W.3d at 612 (quoting Threadgill v. Bd. of Prof'l Responsibility, 299 S.W.3d 792, 807 (Tenn. 2009), overruled on other grounds by Lockett v. Bd. of Prof'l Responsibility, 380 S.W.3d 19, 27–28 (Tenn. 2012)); see also Sallee v. Bd. of Prof'l Responsibility, 469 S.W.3d 18, 36 (Tenn. 2015).

We review questions of law de novo but do not substitute our judgment for that of a hearing panel as to the weight of the evidence on questions of fact. Daniel, 549 S.W.3d at 100 (citing Maddux, 409 S.W.3d at 622); see also Tenn. Sup. Ct. R. 9, § 33.1(b) (2018) (stating that in determining the substantiality of evidence, the court shall not substitute its judgment for that of the hearing panel as to the weight of the evidence on questions of fact).

Finally, this Court's review of attorney disciplinary appeals is conducted in light of our inherent power to promulgate and enforce disciplinary rules and to ensure that these rules are enforced in a manner that preserves both the integrity of the bar and the public trust in our system of justice. See Hughes v. Bd. of Prof'l Responsibility, 259 S.W.3d 631, 647 (Tenn. 2008).

Green v. Bd. of Prof'l Responsibility of Supreme Court of Tennessee, 567 S.W.3d 700, 712–13 (Tenn. 2019) (footnote omitted). With these principles in mind, we evaluate Mr. Justice's claims.[16]

---

[16] Mr. Justice lists seventeen issues in the appropriate section of his brief but also advances many others in the argument portion of his brief. We decline to separately address each issue raised because many have not been properly preserved and others are too outlandish to dignify with discussion. For example, at oral argument, Mr. Justice argued through counsel that he should receive a new hearing because the trial judge's given name illustrates bias. Not only is this argument without merit, it is absurd.

### III. Analysis

#### *A. Rulings on the Admissibility of Evidence*

Mr. Justice challenges the Hearing Panel's rulings on certain evidence. As the challenger, Mr. Justice bears the burden of establishing that the Hearing Panel abused its discretion. Bd. of Prof'l Responsibility of Supreme Court of Tennessee v. Sheppard, 556 S.W.3d 139, 146 (Tenn. 2018). A hearing panel abuses its discretion by applying an incorrect legal standard or reaching a decision that is against logic or reasoning and which causes an injustice to the party complaining. Id. Under this deferential standard of review, if reasonable minds can disagree about the propriety of a hearing panel's decision, this Court will uphold the ruling. Id.

Mr. Justice argues that the Hearing Panel erred by excluding the written declaration of Yalkin Demirkaya, the independent computer consultant he engaged to search the law firm's computers for the Word document. Because the Board introduced excerpts of Mr. Justice's testimony from the District Court hearing, Mr. Justice claims that the rule of completeness embodied in Tennessee Rule of Evidence 106 entitled him to introduce Mr. Demirkaya's written declaration, which was admitted into evidence in the District Court hearing by agreement of the parties. The Board argues that Rule 106 does not entitle Mr. Justice to introduce a writing prepared by another person. The Board is correct.

Tennessee Rule of Evidence 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Tenn. R. Evid. 106. This evidentiary rule:

> reflects a concern for fairness and is designed to let the jury assess related information at the same time rather than piecemeal. This should help the jury avoid being misled by hearing only partial information about a writing or recorded statement. Moreover, it will assist the jury in assessing the weight to be given to the written or recorded statement by permitting the jury to consider at the same time other relevant writings and recordings.

Neil P. Cohen, Sarah Y. Sheppeard, and Donald F. Paine, Tennessee Law of Evidence § 1.06[2][a] (6th Ed. 2011 LexisNexis Matthew Bender) (footnotes omitted). Applied in this case, Rule 106 means that when the Board introduced excerpts of Mr. Justice's

testimony in the District Court, then Mr. Justice could have introduced any other parts of his own testimony that "ought in fairness to be considered contemporaneously with it." Tenn. R. Evid. 106; see also State v. Keough, 18 S.W.3d 175, 182 (Tenn. 2000) (explaining how Rule 106 applies in criminal cases). The Hearing Panel appropriately allowed Mr. Justice to introduce other parts of his District Court testimony. Rule 106 did not authorize Mr. Justice to introduce the testimony or proof other persons provided in the District Court. The Hearing Panel thus did not abuse its discretion by excluding Mr. Demirkaya's written declaration.

Also without merit is Mr. Justice's assertion that the Hearing Panel erred by admitting Mr. Kerschberg's testimony by written deposition. Tennessee Rule of Civil Procedure 32.01 provides:

> At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the Tennessee Rules of Evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof . . . .

Tenn. R. Civ. P. 32.01. Mr. Justice initiated Mr. Kerschberg's deposition and obviously had notice of it. Additionally, the record belies his assertion that the Hearing Panel and trial court improperly limited his opportunity to impeach Mr. Kerschberg on grounds of Mr. Kerschberg's mental health. As the trial court pointed out, Mr. Justice failed to proffer redirect questions after he was served with the Board's cross-examination questions, and this was the proper procedure for initiating redirect when a witness is deposed upon written questions. See Tenn. R. Civ. P. 31.01 (describing the procedure for depositions upon written questions and stating that "[w]ithin 10 days after being served with cross questions, a party may serve redirect questions upon all other parties" and "[w]ithin 10 days after being served with redirect questions, a party may serve recross questions upon all other parties"). This issue is without merit.

### B. Interference with Decision to Testify

Mr. Justice argues that the Hearing Panel deprived him of the ability to make an intelligent choice about testifying when it delayed ruling on whether it could draw an adverse inference from his invocation of his constitutional privilege against self-incrimination in his prehearing deposition. This argument, too, is without merit.

On the first day of the hearing, January 20, 2015, the Hearing Panel ruled that Akers v. Prime Succession of Tennessee, Inc., 387 S.W.3d 495 (Tenn. 2012) applies to attorney-disciplinary proceedings. Under Akers, "the trier of fact may draw a negative inference from a party's invocation of the Fifth Amendment privilege in a civil case only

when there is independent evidence of the fact to which a party refuses to answer by invoking his or her Fifth Amendment privilege." Id. at 506–07. The Hearing Panel reserved its ruling on whether it would actually draw an adverse inference based on Mr. Justice's invocation of the privilege at his prehearing deposition until after the Board presented its proof so that it could determine whether the requirements of Akers had been satisfied.

As already noted, the Board did not call Mr. Justice as a witness at the hearing, but it introduced excerpts of his former testimony in the District Court and also the transcript of his deposition. Mr. Justice also introduced excerpts of his former testimony in the District Court.[17] When the Board closed its proof, Mr. Justice moved for an involuntary dismissal, arguing that the Board had failed to prove its case. The Hearing Panel denied this motion. Mr. Justice then asked for permission to delay the presentation of his proof until the next day so that he would have the opportunity to decide overnight, after consultation with his attorney, whether to testify in his own behalf. The Hearing Panel granted this request. When the proceedings resumed the next day, Mr. Justice chose to testify, although he asserted before doing so that the Hearing Panel had erred by ruling that Akers applies to lawyer disciplinary proceedings. In its written ruling, the Hearing Panel expressly declined to draw an adverse inference against Mr. Justice for his invocation of the right against self-incrimination and explicitly based its decision on the evidence presented at the hearing. The trial court affirmed the Hearing Panel's decision.

As the foregoing recitation illustrates, the Hearing Panel ruled before the hearing began on whether it could draw an adverse inference from Mr. Justice's prehearing invocation of his privilege against self-incrimination. After the Board presented its proof, the Hearing Panel allowed Mr. Justice another evening to consult with his attorney and decide whether he would testify. The Hearing Panel did not interfere with or hinder Mr. Justice from intelligently deciding whether to testify.[18]

---

[17] For reasons not clear from the record, Disciplinary Counsel apparently agreed not to argue that Mr. Justice had implicitly waived his right to invoke the privilege against self-incrimination in the disciplinary proceeding by testifying in the District Court.

[18] Because the Hearing Panel expressly declined to draw an adverse inference from Mr. Justice's prehearing invocation of his privilege against self-incrimination, we need not address Mr. Justice's assertion that the Hearing Panel erred by ruling that an adverse inference may be drawn from an attorney's invocation of the privilege in a lawyer-disciplinary proceeding. See People v. Robnett, 859 P.2d 872, 875 (Colo. 1993) ("We need not resolve the question whether the fact finder in an attorney disciplinary proceeding may draw a negative inference from an attorney-respondent's invocation of the Fifth Amendment privilege against self-incrimination, however, because there is no indication that the hearing board below drew any such inference."). We reserve decision on this issue of first impression for another day. We note that courts in Georgia, New York, and Wisconsin have allowed an adverse inference to be drawn in such circumstances in attorney-disciplinary cases. See In re Meier, 334 S.E.2d

## C. Procedural Challenges

### 1. Questioning by the Hearing Panel

Mr. Justice argues that the Chair of the Hearing Panel erred by extensively questioning him and Mr. Rickman. We disagree. As this Court has stated in another attorney-disciplinary proceeding where the hearing panel chair questioned the attorney: "The Tennessee Rules of Evidence apply to attorney disciplinary proceedings, Tenn. Sup.Ct. R. 9, § 23.3, and Tennessee Rule of Evidence 614 allows the Panel to interrogate witnesses." Bd. of Prof'l Responsibility v. Reguli, 489 S.W.3d 408, 419 (Tenn. 2015).

### 2. Insufficient Findings and Conclusions

Mr. Justice argues that the Hearing Panel and the trial court failed to make sufficient written findings of fact and conclusions of law. We disagree. Both the Hearing Panel and the trial court rendered thorough written decisions setting out facts and conclusions. Adjudicators are not required to address every issue that lacks merit. See Hodge v. Provident Life & Accident. Ins. Co., 664 S.W.2d 297, 300 (Tenn. Ct. App. 1983) (stating that a trial court need not "treat separately each fact or question at issue so long as [its] findings as a whole cover all relevant facts necessary to a determination of the case"); Adkins v. Bluegrass Estates, Inc., 360 S.W.3d 404, 415 (Tenn. Ct. App. 2011) (same).

### 3. Insufficient Fraud Allegation

We also reject Mr. Justice's argument that the Board failed to plead fraud with sufficient specificity. The Board's petition for discipline clearly states which Rules of Professional Conduct Mr. Justice allegedly violated and the facts alleged to constitute the violations. Mr. Justice filed a response to the petition, but after doing so he moved to dismiss the petition and in the alternative requested a more definite statement, citing Tennessee Rule of Civil Procedure 12.05.[19] Because he had filed a response, Rule 12.05 technically did not apply, but the Hearing Panel nonetheless granted his motion in part and required the Board to identify the Itemization entries that it alleged were false. The

---

212, 213 (Ga. 1986); In re Snyder, 897 N.Y.S.2d 398, 399–400 (N.Y. App. Div. 2010); In re Muraskin, 731 N.Y.S 2d 458 (N.Y. App. Div. 2001); State v. Postorino, 193 N.W.2d 1, 3 (Wis. 1972).

[19] Tennessee Rule of Civil Procedure 12.05 provides that "[i]f a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Tenn. R. Civ. P. 12.05.

Board then identified the seventeen entries, quoted herein, that it alleged were copied from Mr. Kerschberg's invoices. Thus, contrary to Mr. Justice's assertions, the Board provided him with very specific notice of the allegations of fraud and the claims against him. This issue is without merit.

### 4. Service of Process

Mr. Justice next argues that: (i) the Hearing Panel's decision was not properly served on him; (ii) he was not properly served with the Board's petition for writ of certiorari; and (iii) the summons with which he was served was defective.

Mr. Justice's claim that he was not properly served with the Hearing Panel's decision is without merit. Tennessee Supreme Court Rule 9, section 8.3 provides that "[t]he Board shall immediately serve a copy of the findings and judgment of the hearing panel upon the respondent and the respondent's counsel of record." Tennessee Supreme Court Rule 9, section 12.2 provides that "[s]ervice of any other papers or notices required by these Rules shall, unless otherwise provided by these Rules, be made in accordance with Rule 5.02, Tennessee Rules of Civil Procedure." Tennessee Rule of Civil Procedure 5.02 says, in relevant part, that, "[w]henever . . . service is <u>required</u> . . . to be made on a party represented by an attorney, *the service shall be made upon the attorney* unless service upon the party is ordered by the court." (Emphasis added.) Here, the Board served Mr. Justice by mailing a copy of the Hearing Panel's judgment to him in the care of his attorney on March 9, 2015. The Board therefore complied fully with the requirements of Tennessee Supreme Court Rule 9, sections 8.3 and 12.2 when it served Mr. Justice's attorney with a copy of the Hearing Panel's judgment.

Mr. Justice's claim that he was not properly served with the Board's petition for writ of certiorari also is without merit. The petition was mailed to the Clerk and Master of the Chancery Court for Knox County on April 9, 2015, and filed on April 13, 2015. Before mailing the petition, the Board contacted Mr. Justice's attorney to inquire whether he would accept service on Mr. Justice's behalf. Mr. Justice's attorney responded on April 28, 2015, that he would not accept service. The Board then wrote the Clerk and Master requesting issuance of a summons for service on Mr. Justice. This summons was issued on April 30, 2015, only seventeen days after the filing of the Board's petition for writ of certiorari. This summons was served on May 5, 2015, but because someone other than Mr. Justice had actually signed the summons, the Board requested issuance of an alias summons. This alias summons was personally served on Mr. Justice by a private process server on July 23, 2015. This chronology refutes Mr. Justice's claim that the Board intentionally delayed issuance of the summons and failed to properly serve him with the petition for writ of certiorari.

Mr. Justice's next claims that, because the alias summons incorrectly listed $4,000 as the personal exemption, the Board's petition should be dismissed. In Sneed v. Board of Professional Responsibility, 301 S.W.3d 603, 613 (Tenn. 2010), this Court held that "[u]nder Tennessee Supreme Court Rule 9, section 1.3, the purported unlawful procedure must have resulted in prejudice to the petitioner." Here, as in Sneed, no prejudice has been shown, so dismissal is not appropriate.[20]

## D. Substantial and Material Evidence

Mr. Justice asserts that the Hearing Panel's decision is not supported by substantial and material evidence. In determining whether substantial and material evidence supports the Hearing Panel's decision, this Court "take[s] into account whatever in the record fairly detracts" from the weight of the evidence, but this Court does "not substitute its judgment for that of the [Hearing Panel] as to the weight of the evidence on questions of fact." Tenn. Sup. Ct. R. 9, § 1.3. Mr. Justice argues that the evidence against him was entirely circumstantial, and as a result, does not rise to the level of substantial and material evidence. He asserts that circumstantial evidence has less probative value than direct evidence. Despite Mr. Justice's protestations to the contrary, in evaluating the evidence, we do not differentiate between direct and circumstantial evidence. Tennessee law draws no distinction between the probative value of direct and circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011) (stating that a criminal conviction may be based solely on circumstantial evidence and that the prosecution need not disprove alternative theories of guilt when relying on circumstantial evidence alone); Hindman v. Doe, 241 S.W.3d 464, 468 (Tenn. Ct. App. 2007) (stating that "the law does not distinguish between the probative value of direct evidence and the probative value of circumstantial evidence"). This Court determines whether the evidence "furnishes a reasonably sound factual basis for the decision being reviewed." City of Memphis v. Civil Serv. Comm'n of Memphis, 216 S.W.3d 311, 317 (Tenn. 2007) (quoting Jackson Mobilphone Co., Inc. v. Tenn. Pub. Serv. Comm'n, 876 S.W.2d 106, 111 (Tenn. Ct. App. 1993)). We conclude, based on our review of the

---

[20] As he did in the trial court, in his brief to this Court, Mr. Justice insinuates that he has been targeted by the Board, the Hearing Panel, and the trial court for reasons outside this record. As an example, Mr. Justice claims that the trial judge and the attorney for the Board engaged in inappropriate *ex parte* communication during a chance encounter in a hotel lobby at approximately 8:45 a.m. on the morning of the hearing before the trial judge. The record belies this claim and establishes that the trial judge and the Board's lawyer discussed only a scheduling matter, in particular, the time the hearing would begin. The Board's lawyer promptly notified Mr. Justice and his attorney of this chance meeting and conversation and in their presence texted the trial judge the start time of the hearing. The trial court and the Board's conversation about scheduling did not constitute inappropriate *ex parte* communication. See Tenn. Sup. Ct. R. 10, RJC 2.9(A)(1).

record on appeal, that the evidence, as already recounted herein, furnishes an eminently sound factual basis for the Hearing Panel's decision.[21]

The proof in the record on appeal establishes that the Itemization included seventeen entries purporting to describe Mr. Justice's work on the Thomas case that were either identical or nearly identical to entries on Mr. Kerschberg's invoices that described Mr. Kerschberg's work on the Thomas case. In his preliminary itemization, Mr. Justice referred to himself in the third person, which the Board asserted illustrated that he had copied Mr. Kerschberg's invoices. Mr. Kerschberg testified that the invoices described his work on the Thomas case, not Mr. Justice's work, and that, to his knowledge, Mr. Justice "did not ever document his work on the Thomas case or any other case." The record establishes that Mr. Justice paid Mr. Kerschberg for the time claimed on the invoices without question more than a year before he submitted the Itemization. The record contains Mr. Justice's April 11, 2011 email stating that Mr. Justice had billed a lot of time for "reading" Mr. Kerschberg's work. Yet, the Itemization did not include any entry for Mr. Justice "reading" Mr. Kerschberg's work. Mr. Justice testified that this email was simply a reference to the Chamberlain principle that allowed him to charge the higher attorney rate for work that both he and Mr. Kerschberg's performed, but the problem with this claim is twofold. The email does not mention Chamberlain, and Chamberlain actually does not support that proposition. Chamberlain, 1995 WL 769782, at *9. Indeed, the Chamberlain opinion commends the "judicious" use of paralegals and other such resources as a way to "lower overall fees." Id. Other decisions citing Chamberlain also do not interpret the opinion as Mr. Justice does. One of those opinions actually makes the opposite point by stating that, when an attorney does a paralegal's work, his fee should be reduced to a paralegal's rate because the work is nonlegal in nature. J.H. v. Bd. of Educ. of Pikeland Coummunity [sic] Unit Sch. Dist. #10, No. 13-

---

[21] The questions Mr. Justice has continued to raise in his brief about the completeness and accuracy of the record on appeal are without merit. This Court remanded the matter to the trial court in accordance with Tennessee Rule of Appellate Procedure 24(e), which provides that "[a]ny differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court." The trial court held a hearing and acknowledged that he had shredded the record, believing it to be a courtesy copy. The trial court reviewed the replacement copy that was provided, resolved the disputes concerning its accuracy and authenticity, certified the record for appeal, and denied Mr. Justice's subsequent attempts to raise new issues. "Absent extraordinary circumstances, the determination of the trial court is conclusive." Tenn. R. App. P. 24(e). Mr. Justice has failed to establish extraordinary circumstances.

CV-3388, 2014 WL 1716564, at *3 (C.D. Ill. May 1, 2014).[22]  Thus, the record supports the Hearing Panel's interpretation of the email as a confirmation that Mr. Justice claimed Mr. Kerschberg's work as his own.  The Hearing Panel found that Mr. Justice gave only implausible explanations for why the Itemization entries were identical or nearly identical to Mr. Kerschberg's invoice entries.  The Hearing Panel did not believe Mr. Justice's testimony that he had performed the same administrative tasks, on the same date, and for the same amount of time as work Mr. Kerschberg had done and been compensated for more than a year before the Itemization was submitted.  This Court does not second-guess the Hearing Panel's credibility findings.

Furthermore, no other proof in the record on appeal casts doubt on the Hearing Panel's credibility findings.  For example, even though Mr. Justice testified that neither he nor anyone else at the law firm ordinarily records time, he failed to keep a single document showing that he had in this one unusual circumstance contemporaneously recorded his time on the Thomas case.  Although Mr. Rickman produced an email by which he had reported his time, this email was dated after the District Court's order awarding the sanction.  Nor could Mr. Justice locate a version of the Word document containing all the time records that predated the District Court's order awarding the sanction.  He also could not recall the name of the Word document.

Mr. Justice asserts that the Hearing Panel's decision lacks substantial and material evidentiary support because Mr. Kerschberg recanted his original allegations of misconduct.  This assertion is simply incorrect.  While Mr. Kerschberg acknowledged occasionally using Mr. Justice's handwritten comments to create some of the narratives for his invoices, he unequivocally and consistently testified that these narrative entries described his own work not Mr. Justice's.  Mr. Kerschberg recognized the possibility that Mr. Justice could have done work similar to his own on the Thomas case without Mr. Kerschber's knowledge, but Mr. Kerschberg reiterated that, "When I created these invoices, however, I was documenting only my own work.  *As far as I know, Loring Justice did not ever document his work on the Thomas case, or any other case.*" (Emphasis added).

We also disagree with Mr. Justice's assertion that the Hearing Panel and the trial court ignored and "manipulated" his testimony and that of Mr. Rickman.  The Hearing Panel considered the testimony in context and noted that Mr. Rickman had not worked for the law firm when Mr. Kerschberg worked there; did not know what Mr. Justice did

---

[22]  Nor is Chamberlain a landmark case as Mr. Justice has implied.  Chamberlain is an unreported federal district court decision from the Seventh Circuit applying Illinois law, and according to Westlaw, it has only been cited in twenty-five cases: twenty-three times by Illinois federal courts, once by a Minnesota federal court, and once by the Tennessee federal court ordering Mr. Justice's suspension.

or did not do before he began working at the law firm; did not compare the Itemization to Mr. Kerschberg's invoices; and did not see the Word document until after the District Court awarded the discovery sanction. The record fully supports the Hearing Panel's findings and the trial court's conclusion that Mr. Rickman "was in no position to determine the accuracy of [Mr.] Justice's entries."

The Hearing Panel considered but rejected Mr. Rickman's and Mr. Justice's broad interpretation of the District Court's order, concluding that it was inconsistent with the clear text of the order. The Hearing Panel also considered but rejected Mr. Justice's and Mr. Rickman's testimony that they intended to give the attorney's fees to Mr. Thomas and described this testimony as "unbelievable" and as "post-conduct rationale." The Hearing Panel and the trial court neither ignored nor manipulated Mr. Rickman's and Mr. Justice's testimony.

Mr. Justice argues that the Hearing Panel's decision that he violated RPC 1.5(a), which provides that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses" is not supported by substantial and material evidence. Specifically, Mr. Justice asserts that he did not charge an unreasonable fee because the sanction would have been paid to his client not the firm and because he never received any fee after the proceedings began in the District Court. The Hearing Panel disbelieved Mr. Justice's testimony that any fee collected would have been given to Mr. Thomas. As already noted, this Court does not second-guess the Hearing Panel's credibility determinations.

Additionally, we note that courts in other states have held that a lawyer may "charge" an unreasonable fee without actually collecting it. For example, in Iowa Supreme Court Board of Professional Ethics & Conduct v. Hoffman, 572 N.W.2d 904, 907 (Iowa 1997), the Iowa Supreme Court considered whether a lawyer had violated an ethical rule that prohibited lawyers "from entering into an agreement for, charging, or collecting an illegal or clearly excessive fee." The lawyer in Hoffman argued that his actions in filing the fee application with an Iowa administrative worker's compensation judge did not violate the disciplinary rule "because he never actually received the amount requested." Id. The Iowa Supreme Court rejected this argument, stating that the lawyer's actions in seeking the fee "fit within the legal definition of charge: 'to create a claim against property; to assess; to demand.'" Id. at 908 (quoting Black's Law Dictionary 232 (6th ed.1990)); see also Comm. on Prof'l Ethics & Conduct v. Zimmerman, 465 N.W.2d 288, 291–92 (Iowa 1991) (stating that a lawyer's application for excessive and duplicative fees violated a disciplinary rule prohibiting lawyers from charging an excessive fee).

Having carefully and fully considered the record on appeal, we conclude that ample substantial and material evidence supports the Hearing Panel's findings of fact, which the trial court adopted.

## E. Appropriateness of the Sanction

To assess the appropriateness of the disciplinary sanction in a given case, this Court begins with the ABA Standards. See Tenn. Sup. Ct. R. 9, § 8.4 (currently § 15.4); Daniel, 549 S.W.3d at 100. The ABA Standards are "guideposts" rather than rigid rules for determining appropriate and consistent sanctions for attorney misconduct. Id. (quoting Maddux III, 409 S.W.3d at 624).

> [T]he standards are not designed to propose a specific sanction for each of the myriad of fact patterns in cases of lawyer misconduct. Rather, the standards provide a theoretical framework to guide the courts in imposing sanctions. The ultimate sanction imposed will depend on the presence of any aggravating or mitigating factors in that particular situation. The standards thus . . . are guidelines which give courts the flexibility to select the appropriate sanction in each particular case of lawyer misconduct.

ABA Standards, Theoretical Framework. The presumptive sanction in each case may be identified by considering:

> (1) the ethical duty the lawyer violated—whether to a client, the public, the legal system, or duties as a professional; (2) the lawyer's mental state; and (3) the extent of the actual or potential injury caused by the lawyer's misconduct." Next, any aggravating or mitigating circumstances must be considered in determining whether to increase or decrease the presumptive sanction in a particular case.

Daniel, 549 S.W.2d at 100 (citations omitted).

As already noted, the Hearing Panel failed to consider the ABA Standards identifying the presumptive sanction. The trial court concluded ABA Standard 5.11(b) applies in these circumstances, and it provides:

> Disbarment is generally appropriate when . . . a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

In light of the Hearing Panel's findings that Mr. Justice gave a false statement under oath, knowingly testified falsely in the District Court, and sought an unreasonable fee in the Itemization, we conclude that the trial court correctly identified ABA Standard 5.11(b) as establishing the presumptive sanction. The trial court also correctly concluded that the substantial and material evidence supports the Hearing Panel's findings of the six aggravating factors—a dishonest or selfish motive, a pattern of misconduct, multiple offenses, submission of false evidence, false statements during the disciplinary process, refusal to acknowledge wrongful nature of conduct, and substantial experience in the practice of law—and the two mitigating factors of the District Court's prior six-month suspension for the same conduct and Mr. Justice's lack of a prior disciplinary record.

Mr. Justice asserts that the trial court also should have considered as a mitigating factor the delay in this matter, pointing out that the alleged misconduct occurred in 2011 and the hearing was not held until 2015. While this argument is appealing in theory, in fact it is not persuasive because most of this delay is attributable to Mr. Justice's request that the Board hold its investigation in abeyance pending the disposition of the federal proceedings. So, we cannot say that the Hearing Panel and the trial court erred by declining to consider delay as a mitigating factor.

We also disagree with Mr. Justice that his good record and lack of ethical violations in the ensuing years should be viewed as mitigating factors. Lawyers are professionally obligated to comply with the Rules of Professional Conduct, and compliance is the norm and expectation. It does not mitigate a lawyer's previous failure to fulfill his professional obligation.

Mr. Justice also asserts that the Hearing Panel did not err by imposing a sanction less severe than the presumptive sanction of disbarment because in Daniel, this Court changed "controlling legal authority" and held that it is not error for a hearing panel to consider sanctions less than the presumptive sanction. 549 S.W.3d at 102. Although Mr. Justice is correct as to the holding of Daniel, his characterization of the decision as a change in controlling legal authority is not correct. Daniel simply applied prior decisions of this Court that had described the ABA Standards as "'guideposts.'" Daniel, 549 S.W.3d at 100 (quoting Maddux III, 409 S.W.3d at 624). More importantly, Daniel is factually distinct from this case. Here, the Hearing Panel did not consider and reject the presumptive sanction of disbarment. It simply failed to consider any ABA Standard identifying presumptive sanctions.

We agree with the Board that the trial court's modification of the sanction was appropriate, considering the Hearing Panel's lack of analysis of the presumptive sanction under the ABA Standards, the imbalance of aggravating and mitigating factors, and the nature of Mr. Justice's misconduct, which evidenced his utter disregard for the fundamental obligation of lawyers to be truthful and honest officers of the court. Culp v.

Bd. of Prof'l Responsibility, 407 S.W.3d 201, 211 (Tenn. 2013) (denying reinstatement to an attorney convicted of extortion and stating that the attorney had engaged in "egregious conduct," conduct striking "at the heart of our system of justice" and "threatening the very core of a legal system based on probity and honor"); Murphy v. Bd. of Prof'l Responsibility, 924 S.W.2d 643, 647 (Tenn. 1996) (finding that the conduct of lying to a grand jury and trying to convince another witness to lie to the grand jury "strikes at the very heart and soul of the judicial system and without question would have a detrimental impact on the integrity and standing of the bar, the administration of justice and the public interest"). Recognizing that the sanction of disbarment is not to be imposed lightly, the trial court conscientiously and carefully analyzed the issues and ultimately concluded, as do we, that Mr. Justice's conduct in claiming Mr. Kerschberg's work as his own, in submitting the false Itemization and written declaration, and in testifying falsely in the District Court strikes at the very heart of the legal profession and merits the presumptive sanction of disbarment.

Mr. Justice argues that Napolitano v. Bd. of Prof'l Responsibility, 535 S.W.3d 481 (Tenn. 2017) illustrates that disbarment is too harsh a punishment here. In Napolitano, the hearing panel found that the attorney had committed trust account violations and lied under oath when answering discovery deposition questions in a lawsuit over a fee dispute with a client. Id. at 503. The hearing panel suspended the attorney for five years but ordered only one year of active suspension. Id. at 494. This case bears some factual resemblance to Napolitano, but it is distinct in at least two important respects. First, this Court found that the record in Napolitano did not support a finding that the attorney gave false testimony "with the intent to deceive a court." Id. at 503. Additionally, unlike Mr. Justice, Mr. Napolitano called a number of lawyers and judges to testify to his good professional and personal character. Id. at 487–89. Each attorney disciplinary appeal is evaluated "in light of its particular facts and circumstances." Maddux, 148 S.W.3d at 40.

In another recent case factually similar to this one, Board of Prof'l Responsibility v. Barry, 545 S.W.3d 408 (Tenn. 2018), this Court upheld the trial court's modification of the sanction to disbarment. In Barry, the hearing panel imposed an eighteen-month suspension, with sixty days active suspension. Id. at 411–412. The trial court modified the sanction to disbarment, and this Court affirmed. Id. at 412 In Barry, as here, the hearing panel had failed to consider the ABA Standards regarding presumptive sanctions. Id. at 420. In Barry, as here, the hearing panel found that the attorney's misconduct was "knowing." Id. at 425. The trial court's decision modifying the sanction in this case from suspension to disbarment is consistent with Barry. See also Hornbeck v. Bd. of Prof'l Responsibility, 545 S.W.3d 386, 387 (Tenn. 2018) (disbarring an attorney based upon multiple acts of professional misconduct, "including knowing conversion of client funds with substantial injury to clients, submitting false testimony, falsifying documents in court proceedings, engaging in the unauthorized practice of law, violating Supreme Court orders, and defrauding clients").

## IV. Conclusion

For the reasons stated herein, we affirm the judgment of the trial court in all respects, including its modification of the sanction from suspension to disbarment. Costs of this appeal are taxed to Loring Edwin Justice for which execution may issue if necessary.

_____

CORNELIA A. CLARK, JUSTICE