IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 30, 2022

## IN RE: JAMES RALPH HICKMAN, JR., BPR #020125

_____

### No. M2022-00755-SC-BAR-BP

_____

In this case, we consider the appropriate discipline for Tennessee attorney James Ralph Hickman, Jr. The Board of Professional Responsibility filed a petition for discipline against Hickman alleging that he violated the Rules of Professional Conduct while representing an estate in probate proceedings. A hearing panel of the Board adjudicated the petition and recommended a one-year suspension, with "at least" ninety days served as an active suspension and the rest on probation. Any violation of the conditions of probation would result in "reversion to active suspension." The hearing panel also directed Hickman to obtain a practice monitor during the probationary period, complete fifteen additional hours of estate-management continuing legal education ("CLE") and three additional hours of ethics CLE, and pay the costs of the matter. Neither Hickman nor the Board appealed. The Board petitioned this Court for an order enforcing the hearing panel's judgment. Exercising our authority under Tennessee Supreme Court Rule 9, section 15.4, we determined that the punishment imposed by the hearing panel appeared too lenient and proposed to increase it. After carefully considering the entire record, "with a view to attaining uniformity of punishment throughout the State and appropriateness of punishment under the circumstances of each particular case," Tenn. Sup. Ct. R. 9, § 15.4(b), we affirm the hearing panel's one-year suspension but modify the judgment to impose six months of active suspension followed by six months on probation. We also clarify that the period of probation imposed should be fixed rather than indefinite and that violation of a condition of probation does not automatically result in reversion of the probationary period to active suspension. We affirm the decision of the hearing panel in all other respects.

**Tenn. Sup. Ct. R. 9, § 15.4; Judgment of the Hearing Panel Modified in Part; Affirmed in Part**

SARAH K. CAMPBELL, J., delivered the opinion of the court, in which ROGER A. PAGE, C.J., and SHARON G. LEE, JEFFREY S. BIVINS, and HOLLY KIRBY, JJ., joined.

James W. Milam, Brentwood, Tennessee, for the Petitioner, Board of Professional Responsibility.

Gregory Brown, Colleen T.G. Conboy, and G. Alan Rawls, Knoxville, Tennessee, for the Respondent, James Ralph Hickman, Jr.

## OPINION

### I. Factual and Procedural Background

James Ralph Hickman, Jr., has been licensed to practice law in Tennessee since 1999. He works as a solo practitioner in Sevier County handling primarily family law and appointed criminal matters. On January 29, 2020, the Board filed a petition for discipline against Hickman alleging that he violated the Rules of Professional Conduct ("RPC") while representing the estate of Betty Marshall Lawrence in probate proceedings. In October 2021, a disciplinary hearing was held in Sevierville, Tennessee. We begin by providing a summary of the facts underlying the Board's petition and of the hearing panel's judgment.[1]

*Betty Marshall Lawrence's Estate*

Hickman's father, James Ralph Hickman, Sr., had a bookkeeping and tax-preparation business in Sevier County. For many years, he prepared taxes for Betty Marshall Lawrence and became well acquainted with her. Lawrence's health began to decline in 2016. Around that time, she executed a power of attorney appointing Hickman's father as her attorney-in-fact.

Lawrence's sister, Peggy Marshall, was her sole heir. The two were estranged and had not spoken in about a year. Marshall eventually became aware that Hickman's father had been appointed as Lawrence's attorney-in-fact, and she began communicating with him about Lawrence's health and other matters.

On October 15, 2016, Lawrence passed away. Marshall emailed Hickman's father to notify him of Lawrence's death. She also emailed Hickman.

In the email to Hickman, Marshall noted that Hickman had "provided legal services" to Lawrence in the "recent past" and expressed interest in "acquir[ing] his services to handle probate" if probate was "part of [his] practice." She requested that Hickman contact her to schedule an appointment with her and her son. The email also mentioned Marshall's "reasonable expectation" that Hickman's father, "as [Lawrence's] POA [and] Accountant, should be involved in providing professional services relating to estate issues to a final settlement." At that time, Marshall believed that she was going to serve as personal representative of her sister's estate. Marshall was no stranger to probate proceedings. She had served as a Clerk and Master for Sevier County for nearly twenty years and as personal representative for the estates of four family members.

---

[1] The factual summary is based on the hearing panel's findings of fact and the administrative record.

The meeting Marshall requested was held on October 17, 2016. Hickman, Marshall, and Marshall's son were in attendance. They discussed the probate process generally but did not discuss legal fees or reach any agreement about fees. At some point after the initial meeting with Hickman, Marshall became aware that her sister had executed a holographic will and two codicils, one of which named Hickman's father—not her—as the personal representative of the estate.[2]

Hickman ultimately was retained by his father to represent Lawrence's estate in the probate proceedings. There was no written agreement between Hickman and his father regarding fees, but Hickman claimed that his father suggested a flat percentage of the value of the gross estate, with the percentage amount based on "a sliding scale which accounted for 'how big a pain [Marshall] was.'" Hickman agreed to this arrangement because he expected "the time and labor involved in probating [Marshall's] estate" to be "significantly more than . . . for another similarly-sized estate" due to "Marshall's reputation, communication style, and role in the administration of the estate."

Two days after her meeting with Hickman, Marshall sent Hickman's father an email stating that she "wish[ed] to wash [her] hands of further involvement" with administration of the estate and requesting that he and Hickman proceed according to Lawrence's wishes.

Marshall apparently had second thoughts, however, and remained involved as administration of the estate moved forward. The next day, she inquired whether it was "reasonable to expect at some point an inventory" of Lawrence's estate. Hickman responded that "the court will require an inventory . . . of real property and financial holdings." Although Marshall was willing to waive bond, she never waived inventory or accounting.

On December 16, 2016, Hickman's father requested a meeting to discuss the estate and invited Hickman, Marshall, her son, and her son's wife to attend. Legal fees were not discussed at that meeting either. Rather than provide Marshall with an inventory, Hickman's father gave her a handwritten document valuing the estate at $103,421.00 and listing assets that included cash, real property, and foreign currency. That document did not identify expenses for legal fees or any other administrative costs.

Marshall emailed Hickman again in January 2017 to request an inventory and accounting. Another email that Marshall sent that month to Hickman and his father

---

[2] Hickman testified that his father also attended the meeting, that Marshall was aware at the time of the meeting that his father was the personal representative, and that the parties decided at the meeting that legal fees would be four to five percent of the gross estate. The hearing panel did not find this testimony credible, in large part because it conflicted with documentary evidence. Hickman's father likewise testified that he and Hickman discussed the fee with Marshall. But "[c]ounsel for the parties acknowledged at trial that the memory of [Hickman's father] appeared to be impacted" by health issues he had been experiencing. The hearing panel "acknowledge[d] that fact as it relate[d] to the weight to be given to his testimony."

referenced her request for an inventory and her "continued inquiries" regarding assets. Yet another email to Hickman's assistant, which was forwarded to Hickman, again referenced Marshall's requests for an inventory. Marshall also emailed Hickman in early June 2017 to request a "status report" and referred to her "legal entitlement as to inventory [and] expense of administration to this point." Despite these and other repeated requests, neither Hickman nor his father provided Marshall with an inventory or accounting.

Marshall also was in communication with Hickman and his father about Lawrence's car. At the time of her death, Lawrence owned a 2000 Ford Taurus. Hickman's father took possession of the car on October 21, 2016, and offered to purchase it from the estate for $800. After receiving that offer, Marshall received an offer from a third party offering her $3,000 for the car. Hickman's father eventually transferred title to himself without paying the estate.

Marshall wanted the probate proceeding completed as soon as possible. To that end, a final meeting was held on June 26, 2017. Hickman, his father, Marshall, and Marshall's son attended the meeting. Neither Hickman nor his father provided Marshall with an inventory at that meeting. Marshall's son testified that he specifically raised the issue of fees at the meeting because the fee arrangement had not been disclosed, and he knew it was a question on his mother's mind. But the fee arrangement was not disclosed at this meeting either.

Hickman presented Marshall with a $77,000 check for her portion of the estate and asked her to sign a receipt and release, which indicated the estate could be closed because the personal representative had properly distributed and administered the estate. Marshall's son testified that, when Marshall was presented with the document, she became upset and said the administration of the estate had not been handled properly. Frustrated, but knowing that her son wanted her to wrap things up, Marshall eventually said, "Just hand me the damn thing," and signed the release, but only after Hickman assured her that his father would file and provide her with an inventory and final accounting. She believed that signing the release was the only way to bring the probate matter to a close and receive her share of the estate. Marshall emailed Hickman the day after the meeting to confirm that he had agreed to provide an inventory and accounting, and Hickman responded that he would be "glad to honor these requests." But neither Hickman nor his father did so.

On June 30, 2017, based on the release that Marshall had signed, Hickman filed a motion to close the estate. The motion stated that certain disbursements from the estate were made "as directed by Peggy Marshall," but no inventory or accounting was filed with the court. Nor did Hickman's filings otherwise disclose how much the estate had paid Hickman in legal fees or Hickman's father for administering the estate. The probate court granted the motion to close the estate on June 30, 2017, in reliance on "the affirmations contained" in Hickman's motion.

Despite never having entered a verbal or written agreement with Marshall regarding the amount of fees to be paid from the estate, Hickman and his father each collected a fee equal to six percent of the gross estate, or $12,000. They calculated the "gross estate" by including real property that did not pass through probate and therefore was not under administration. Excluding this real property, the combined fees received by Hickman and his father amounted to twenty-two percent of the total value of the assets actually under administration. Had Hickman charged his usual hourly rate of $225 for the 14.4 hours he spent representing the estate, he would have earned only $3,240.

Hickman did not notify Marshall that he had filed the motion for closure. She discovered that the estate had been closed when she inquired with the court clerk a few weeks later. On July 20, 2017, Marshall emailed Hickman and his father to inform them that she had learned the estate was closed. She noted that the "costs of administration" still had not been disclosed and indicated that she was considering reopening the estate.

Marshall soon filed a petition to reopen the estate. The probate court granted her petition, and she obtained new counsel to litigate the matter. The probate court ordered Hickman and his father to file fee applications for any fees they had received from the estate. Hickman filed a fee application which stated:

> At the initial meeting between [Hickman, his father, and Marshall], a flat, percentage fee was discussed and was agreed to by [Marshall]. Her only concern was that she would not be in any way liable for the fee. That meeting occurred October 17, 2016. The agreed percentage was 6 (6%) percent each for the Personal Representative [Hickman's father] and counsel [Hickman]. At each time this was discussed there was a conversation about how the percentage would be calculated as well as the specific percentage. This agreement was discussed again at the June 26, 2017, meeting before [Marshall] signed the Receipt and Release.

The probate court also ordered Hickman's father to file an inventory and accounting. Although Hickman repeatedly urged his father to comply with the order, his father failed to timely submit the documents and filed them only after the court threatened to hold him in contempt.

Marshall objected to the inventory and accounting. The probate court ultimately disallowed the $24,000 in fees paid out of the estate to Hickman and his father because they "were unreasonable and without a basis in law or contract." The court also required Hickman's father to pay the estate for Lawrence's car and to pay the attorney's fees Marshall incurred in bringing the petition to reopen. In all, the probate court charged Hickman's father with the $32,217.14 that was owed to the estate after ruling on Marshall's objections to his accounting and inventory, as well as attorney's fees. Hickman and his

father initially appealed the probate court's ruling, but the appeal was dismissed after Hickman paid $32,600.30 in settlement of the judgment against his father.

Both Marshall and the probate judge filed complaints against Hickman with the Board of Professional Responsibility. On January 29, 2020, the Board filed a formal petition for discipline against Hickman based on those two complaints. On October 19–20, 2021, a final hearing on the Board's petition was held in Sevierville.

*Hearing Panel's Judgment*

The hearing panel issued its written judgment on January 19, 2022. The panel concluded that Hickman had violated three Rules of Professional Conduct: 1.5(a) (Fees), 3.3(a)(1) (Candor Toward the Tribunal), and 8.4(c) (Misconduct). *See* Tenn. Sup. Ct. R. 8.

Rule 1.5(a) provides that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." *Id.*, RPC 1.5(a). The hearing panel concluded that Hickman violated this rule by failing to make an appropriate fee arrangement and by collecting an unreasonably excessive fee.

Rule 3.3(a)(1) provides that "[a] lawyer shall not knowingly make a false statement of fact or law to a tribunal." *Id.*, RPC 3.3(a)(1). The hearing panel concluded that Hickman violated this rule by making two false statements of fact to the probate court in documents that he alone signed. First, he filed a motion for closure falsely stating that Marshall had approved the disbursement of funds. Second, he filed a fee application falsely stating that Marshall had agreed to the fee arrangement. The hearing panel noted that Comment 3 to Rule 3.3(a)(1) provides that "an assertion purporting to be on the lawyer's own knowledge . . . may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." *Id.*, RPC 3.3(a)(1) cmt. 3.

Rule 8.4(c) provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." *Id.*, RPC 8.4(c). The hearing panel concluded that Hickman violated this rule "by knowingly filing documents with the Court which contained false statements of material fact and not disclosing the fee arrangement for legal services provided to the estate before pressing Ms. Marshall to sign the Receipt and Release," by "failing to fulfill his duties to an heir of the estate as counsel for the estate in apprising her of her rights," and "by failing to ensure that Ms. Marshall receive an inventory or accounting in a timely and meaningful manner."

Turning to discipline, the hearing panel determined that American Bar Association ("ABA") Standards 4.62,[3] 6.12,[4] and 7.2[5] applied and established suspension as the baseline sanction. *See* Standards for Imposing Lawyer Sanctions 4.62, 6.12, 7.2 (Am. Bar Ass'n, amended 1992) (hereinafter ABA Standards). The panel also noted that ABA Standard 2.3 provides that the period of suspension should be at least six months. Under ABA Standard 9.1, the hearing panel considered aggravating and mitigating factors to determine the appropriate discipline for Hickman. The panel considered as aggravating factors Hickman's (1) dishonest or selfish motive; (2) refusal to acknowledge the wrongful nature of his conduct; and (3) substantial experience in the practice of law. The only mitigating factor the panel considered was Hickman's lack of a prior disciplinary record.

The hearing panel ultimately recommended a one-year suspension and directed that "no less than [ninety] days of this suspension should be an active suspension." The remainder of the suspension would be served on probation. During that probationary period, Hickman was required to obtain a practice monitor who would report monthly to disciplinary counsel. The hearing panel instructed that the active suspension should remain in place until a practice monitor had been selected and retained. The panel also required Hickman to complete fifteen additional hours of estate-management CLE and three additional hours of ethics CLE and to pay the costs of the matter. Should Hickman fail to comply with any conditions of probation, the judgment provided that the period of probation would "rever[t] to active suspension for the remainder of the suspension period." Neither party appealed from the hearing panel's decision. On June 6, 2022, the Board filed with this Court a notice of submission with a proposed order of enforcement incorporating the hearing panel's decision.

On July 7, 2022, exercising its authority under Tennessee Supreme Court Rule 9, section 15.4, this Court issued an order expressing concern that the sanction was too lenient and not comparable to punishment imposed in similar cases. We also expressed concern that the language the hearing panel used to identify the period of active suspension was too indefinite. We proposed to increase Hickman's punishment pursuant to Tennessee

---

[3] ABA Standard 4.62 provides that "[s]uspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client."

[4] ABA Standard 6.12 provides that

[s]uspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

[5] ABA Standard 7.2 provides that "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty as a professional and causes injury or potential injury to a client, the public, or the legal system."

Supreme Court Rule 9, section 15.4,[6] directed the Board to file the record of the disciplinary hearing, and set a briefing schedule. The matter was submitted to the Court for decision on the record and the briefs, without oral argument.

## II. Standard of Review

"This Court is the final and ultimate arbiter of the propriety of the professional conduct of all lawyers practicing in Tennessee." *Flowers v. Bd. of Pro. Resp.*, 314 S.W.3d 882, 891 (Tenn. 2010). In that role, we promulgate and enforce the rules that govern the legal profession in this State. *Bd. of Pro. Resp. v. MacDonald*, 595 S.W.3d 170, 181 (Tenn. 2020).

When a complaint is filed against an attorney alleging professional misconduct, disciplinary counsel for the Board of Professional Responsibility investigates the allegations. Tenn. Sup. Ct. R. 9, § 15.1(b). At the conclusion of the investigation, disciplinary counsel may recommend dismissal, private informal admonition, private reprimand, public censure, or prosecution of formal charges. *Id.* When a complaint is prosecuted, the matter typically is decided by a hearing panel of the Board. *See id.* § 15.2(a), (d). Disciplinary counsel has the burden to prove allegations against an attorney "by a preponderance of the evidence." *Id.* § 15.2(h).

The hearing panel must submit "its findings and judgment, in the form of a final decree of a trial court, to the Board within thirty days after the conclusion of the hearing." *Id.* § 15.3(a). If a hearing panel recommends discipline, the attorney can appeal the decision or accept the judgment. *See id.* § 33. If the punishment is disbarment, suspension, or public censure and no appeal is perfected from the hearing panel's decision, the Board files with this Court a notice of submission, the judgment, a proposed order of enforcement, and a protocol memorandum. *Id.* § 15.4(b).

Even if neither party appeals the judgment of a hearing panel, we review the judgment under our inherent authority to supervise and regulate the practice of law in Tennessee. *In re Sitton*, 618 S.W.3d 288, 294 (Tenn. 2021); *see also In re Cope*, 549 S.W.3d 71, 73 (Tenn. 2018); *In re Vogel*, 482 S.W.3d 520, 530 (Tenn. 2016). To facilitate that review, we may direct the Board to file the record of the disciplinary proceeding. *See* Tenn. Sup. Ct. R. 9, § 15.4(b). Our review is aimed at "attaining uniformity of punishment throughout the State and appropriateness of punishment under the circumstances of each particular case." *Id.*; *see also id.* § 15.4(d).

---

[6] The Court's order cited section 15.4(d) and (e). The Board correctly notes in a footnote in its brief that the order should have cited section 15.4(b) and (c) instead because neither party appealed. This error is harmless, because the operative language is identical.

If the punishment appears "inadequate or excessive," this Court "issue[s] an order advising the Board and the respondent attorney that it proposes to increase or to decrease the punishment." *Id.* § 15.4(c). When, as here, this Court proposes to increase the punishment, the Court allows the attorney and the Board to file briefs. *Id.*

We review the hearing panel's recommended punishment de novo. *In re Walwyn*, 531 S.W.3d 131, 137 (Tenn. 2017). We consider "all of the circumstances of the particular case and also, for the sake of uniformity, sanctions imposed in other cases presenting similar circumstances." *In re Cope*, 549 S.W.3d at 74 (quoting *Bd. of Pro. Resp. v. Allison*, 284 S.W.3d 316, 327 (Tenn. 2009)). After considering the record and the briefs, we "may modify the judgment of the hearing panel . . . in such manner as [we] deem[] appropriate." Tenn. Sup. Ct. R. 9, § 15.4(c).

## III. Analysis

The main issue presented for our review is whether Hickman's punishment is too lenient. Hickman says it is not and asks us to affirm the hearing panel's judgment. He argues that the circumstances of this case are distinguishable from *Beier v. Board of Professional Responsibility*, 610 S.W.3d 425 (Tenn. 2020), *Board of Professional Responsibility v. Walker*, 638 S.W.3d 127 (Tenn. 2021), and *Board of Professional Responsibility v. Justice*, 577 S.W.3d 908 (Tenn. 2019). According to Hickman, the proposed punishment is consistent with sanctions this Court has approved in other cases involving similar conduct, such as *Nevin v. Board of Professional Responsibility*, 271 S.W.3d 648 (Tenn. 2008). Hickman also contends that the hearing panel should have applied four additional mitigating factors in determining his punishment.

The Board disagrees. It argues that Hickman's punishment is too lenient considering the sanctions imposed in similar cases, and should, at a minimum, be increased to a three-year suspension. The Board posits that the *Walker* and *Justice* cases are the most appropriate comparators. Relying on *Beier*, the Board further argues that the ninety-day period of active suspension is inadequate and should be increased to two years of active suspension.

After reviewing the record and the parties' briefs, our only disagreement with the hearing panel's judgment is the length of the active suspension. As explained below, we conclude that the circumstances of this case and the goal of attaining uniformity of punishment warrant a longer and more clearly defined period of active suspension than the period of "at least" ninety days imposed by the hearing panel.

*Circumstances of This Case*

Before comparing this case to others, we first consider the "appropriateness of punishment under the circumstances of [this] particular case." Tenn. Sup. Ct. R. 9,

§ 15.4(b). The hearing panel correctly found that, given the nature of Hickman's misconduct, ABA Standards 4.62, 6.12, and 7.2 applied and established suspension as the appropriate discipline for Hickman. Hickman agreed to represent Lawrence's estate knowing that his father would be serving as the estate's personal representative, and he never disclosed the fee agreement to Marshall, the sole heir to the estate. Moreover, the fee Hickman received was unreasonable under the circumstances. *See Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 177 (Tenn. 2011) (explaining that the reasonableness of an attorney's fee "must depend upon the particular circumstances of the individual case" (quoting *White v. McBride*, 937 S.W.2d 796, 800 (Tenn. 1996))); Tenn. Sup. Ct. R. 8, RPC 1.5(a)(1)–(10) (listing factors to consider in determining whether a fee is reasonable). Hickman calculated the fee by improperly inflating the gross value of the probate estate to include real property that passed directly to devisees. He also failed to explain why the circumstances of this case justified a fee that so far exceeded what he would have received if billing his usual hourly rate. Finally, Hickman obtained the fee only by falsely representing to the probate court that Marshall had approved the disbursement, and he sought to keep the fee by falsely representing to the probate court that Marshall had agreed to the arrangement.

The hearing panel also considered all of the correct aggravating and mitigating factors. Three aggravating factors counsel in favor of a more severe punishment: Hickman's dishonest or selfish motive, his refusal to acknowledge the wrongful nature of his conduct, and his substantial experience in the practice of law. The hearing panel correctly considered as a mitigating factor that Hickman had no previous disciplinary record.

Hickman contends that four other mitigating factors counsel leniency. We disagree. Hickman claims that he exhibited remorse, ABA Standard 9.32(l), but the record establishes at most that Hickman regretted agreeing to represent the estate in the first place, not that he believed he had done something wrong by collecting the $12,000 fee. Hickman claims that he has a "good reputation in the community." ABA Standard 9.32(g). Other than his own say-so, the only evidence Hickman offers to prove his good reputation is the assertion in his brief that Retired Chief Justice Gary R. Wade has agreed to serve as his practice monitor. But there is nothing in the record to support that assertion. Hickman claims that he cooperated with the Board during the disciplinary process and engaged in full and free disclosure, ABA Standard 9.32(e), but the record tells a different story. The Board's disciplinary counsel had great difficulty eliciting responsive answers from Hickman during the hearing. Finally, Hickman claims that he made a "timely good faith effort to make restitution." ABA Standard 9.32(d). We cannot agree. To be sure, Hickman eventually paid more than $32,000 to settle the judgment against his father. Yet he did so only after the probate court ordered his father to pay that amount, and only after initially appealing the probate court's judgment. Given those circumstances, Hickman's ultimate payment of the judgment seems to have been a pragmatic decision that the amount at issue was not worth the effort to appeal, not a timely good-faith effort to make restitution.

Under our Rules, the period of suspension for an attorney must be more than thirty days but less than ten years. Tenn. Sup. Ct. R. 9, § 12.2(a)(2). ABA Standard 2.3 provides that the period of suspension should fall somewhere between six months and three years. As three aggravating factors cut against Hickman and only one mitigating factor counsels leniency, a one-year period of suspension, which is near the middle of the baseline range, appears to be an appropriate punishment for Hickman's misconduct.

*Comparison to Similar Cases*

The Board urges us to increase Hickman's suspension to three years. It contends that this case presents facts similar to *Walker* and *Justice*. We do not find those cases analogous.

In *Walker*, we affirmed a three-year suspension, with two years active and one year on probation under the supervision of a practice monitor. 638 S.W.3d at 135–36. Walker made false representations to the chancery court and opposing counsel during a tax-sale redemption proceeding, violated an injunction issued in those proceedings resulting in a judgment of criminal contempt, and made false representations in a pro hac vice application filed in a different matter. *Id.* at 130–35. The hearing panel found that Walker had violated seven different Rules of Professional Conduct: 3.1 (Meritorious Claims and Contentions), 3.3 (Candor Toward the Tribunal), 3.4 (Fairness to Opposing Party and Counsel), 4.1 (Truthfulness in Statements to Others), 8.4(a) (Violating or Attempting to Violate the RPCs), 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation), and 8.4(d) (Conduct Prejudicial to the Administration of Justice). *Id.* at 128–29.

Hickman's misconduct does not rise to the same level as Walker's. To be sure, Hickman and Walker both made false representations to a judicial tribunal. Unlike Walker, however, Hickman did not violate any court orders and instead repeatedly urged his father to comply with the probate court's order by filing an inventory and accounting. Nor does Hickman have any record of disciplinary violations in other proceedings. Walker violated seven Rules of Professional Conduct compared to Hickman's three. Thus, while undoubtedly deserving of punishment, Hickman's conduct is not as egregious as Walker's and his punishment therefore should not be as severe.

In *Justice*, this Court affirmed a disbarment. 577 S.W.3d at 933. Justice plagiarized numerous billing entries from a paralegal who was working for him and presented them as his own on the fee statement he filed with a federal district court. *Id.* at 911, 913–17. He also gave false testimony about the fee statement in court. *Id.* at 911. The hearing panel found that Justice violated Rules of Professional Conduct 1.5(a) (Fees), 3.4(b) (Fairness to Opposing Party and Counsel), 8.4(a) (Violating or Attempting to Violate the RPCs), and 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation), and twice violated Rule 3.3(a)(1) (Candor Toward the Tribunal). *Id.* at 921–22. This Court found that six aggravating factors

and only two mitigating factors applied. *Id.* at 932. Considering "the imbalance of aggravating and mitigating factors, and the nature of Mr. Justice's misconduct, which evidenced his utter disregard for the fundamental obligation of lawyers to be truthful and honest officers of the court," the Court concluded that disbarment was the appropriate sanction. *Id.*

Although the Board acknowledges that Hickman's conduct does not "involve the same level of planning as [Justice's] deceitful scheme," it contends that Hickman "clearly deceived" the probate court when he filed the motion to close the estate. We think Hickman's misconduct is significantly less serious than Justice's. Hickman's filings in the probate court contained false representations, but he did not commit forgery, give false testimony, or engage in any other misconduct that, together with his false representations, would have demonstrated the sort of "utter disregard" for the truth at issue in *Justice*. *Id.* at 932. Moreover, Hickman has only three aggravating factors compared to Justice's six. *Id.*

Hickman, meanwhile, points to our decision in *Nevin* in urging us to reduce his suspension to only six months. There, we upheld Nevin's six-month suspension for violating five rules in his representation of three separate clients. *Nevin*, 271 S.W.3d at 650–51, 655.[7]

In the first matter, Nevin served as a conservator for an elderly woman in a nursing home. *See id.* at 651. He failed to comply with a court order requiring him to sell his client's house and land. *Id.* He also used his client's funds to buy two six-month certificates of deposit, even though the probate court's property-management plan indicated that his client would need the funds for living expenses before the certificates matured. *Id.* When his client's funds became insufficient to pay living expenses, Nevin transferred money from his client trust account, which included funds belonging to other clients, to the conservatorship account. *Id.* He testified that he believed he was acting in his client's best interest because liquidating the certificates too early would have resulted in a penalty, and he did not believe any harm would come to his other clients because the client trust account still had "a sufficient balance to meet any obligations." *Id.* Additional infractions included selling his client's land, stocks, and bonds without court approval and comingling his client's funds with monies in his client trust account without recording the transactions. *Id.* at 651–52. Nevin ultimately owed his client $25,000. *Id.* at 655.

In the second matter, Nevin served as personal representative for a woman's estate. *Id.* at 652. He significantly underrepresented estate assets in an inventory he filed with the probate court and nearly doubled his hourly rate for the work he performed. *Id.* He

---

[7] The Code of Professional Responsibility governed Nevin's case because Nevin's actions occurred prior to March 1, 2003, when the Rules of Professional Conduct first took effect. *Nevin*, 271 S.W.3d at 653 n.4.

attempted to blame his secretary for the inventory error even though he reviewed it himself before filing. *Id.* To his credit, he filed an amended inventory within two weeks of learning of the error. *Id.*

In a third matter, Nevin mismanaged guardianship funds for a four-year-old child who had received a medical malpractice settlement. *Id.* at 652–53. With court authorization, Nevin purchased a home for the child and his mother, but improperly put the title in the child's name without indicating that Nevin had purchased the home as guardian for the child. *Id.* at 653. The deed provided that tax bills should be sent to the child, and with no procedure in place to ensure that Nevin would eventually receive the bills, the property taxes went unpaid. *Id.* This failure to pay resulted in the tax sale of the property. *Id.* Also, despite learning that the child's mother was renting the house to a third party, Nevin did nothing to ensure that the rental income went to the child. *Id.*

The hearing panel determined that Nevin had violated five distinct provisions of the then-governing Code of Professional Responsibility and had violated two of those provisions three times each. *Id.* at 653–54. It also found five aggravating circumstances and two mitigating circumstances. *Id.* at 656–57. The hearing panel imposed a suspension of six months, and this Court affirmed. *Id.* at 658–59.

The facts in Nevin's case are not on all fours with those here, but there are strong similarities. Hickman charged the estate an unreasonably excessive fee, far in excess of his usual hourly fee, just as Nevin did in the second matter. Further, like Nevin in the first and second matters, Hickman made false statements to the probate court. In some respects, Hickman's conduct was less serious than Nevin's because he did not comingle funds, mismanage client property, or engage in a pattern of misconduct. In others, however, it was more serious. In *Nevin*, we determined that Nevin "knew *or should have known* that his actions were improper and potentially harmful" and that it was fair to infer that his conduct was "grossly negligent, if not reckless." *Id.* at 658 (emphasis added). Here, by contrast, the hearing panel found that Hickman was "*knowingly deceptive* in failing to disclose the fee arrangement and the amount of fees he received for his legal services."

Our order proposing to increase Hickman's punishment cited our decision in *Beier*, which involved a two-year suspension, as a potentially similar case. 610 S.W.3d at 430. The Board contends that the facts in *Beier* are "closely analogous" to those presented here. Hickman disagrees, noting several differences that make a lesser sanction appropriate in this case.

We agree with the Board that *Beier* presents similar circumstances, but we also agree with Hickman that there are differences that call for a slightly more lenient punishment here. The disciplinary proceedings in *Beier* arose from misconduct in two separate matters. *Id.* The first matter was a child-custody dispute. *Id.* at 431. Beier's client, a divorced father, sought to modify the custody agreement for his daughter. *Id.* Beier

- 13 -

prepared affidavits for both his client and the client's mother. *Id.* The client signed his, but his mother did not sign hers. *Id.* Rather than obtain her signature, however, Beier forged the signature and notarized the affidavit himself. *Id.* He then filed the document in court without advising either the judge or opposing counsel that he had signed the document. *Id.* His actions were discovered when opposing counsel deposed the client's mother and asked if the signature was hers. *Id.* When she failed to answer, Beier interjected, saying that he had "subscribed her signature." *Id.* The client's mother agreed, and Beier later filed a re-verified affidavit, which the client's mother actually signed, making the same statements. *Id.* After opposing counsel filed a motion with the court alleging misconduct with respect to the affidavit and asking the court to impose sanctions, Beier self-reported to the Board. *Id.*

In the second matter, Beier's client asked Beier to represent his deceased aunt's estate. *Id.* Beier knew that the client was disabled because of a nervous condition and required assistance in handling his affairs. *Id.* at 431–32, 444. Beier proposed to the client that he pay 33.3% of the "gross estate" as a contingency fee, and the client agreed to this arrangement. *Id.* at 432. Although the client advised Beier that he had some "half-cousins" who were beneficiaries of the estate by operation of law, Beier failed to contact them when he opened the estate and alleged in his petition that his client was the sole beneficiary. *Id.* He also failed to include the beneficiaries even when their mother contacted him after seeing the estate's notice to creditors. *Id.* Instead, eleven months later, Beier filed a petition to close the estate, in which he reiterated that his client was the sole beneficiary of the estate and asserted that he wanted to close the estate without a detailed accounting. *Id.* The chancery court relied on these representations and closed the estate. *Id.*

In calculating his final fee, Beier included in the value of the gross estate two parcels of real property that were never part of the estate. *Id.* Beier's fee of $78,614 was not subject to judicial approval because the client had purportedly waived his right to a detailed accounting. *Id.*

The client eventually learned that his half-cousins were entitled to a portion of his aunt's estate and hired new counsel, who petitioned to reopen the estate. *Id.* When the new counsel contacted Beier about reopening the estate, Beier reimbursed the estate his entire fee, plus interest. *Id.* Beier again self-reported his misconduct to the Board, and one of the cousins also complained to the Board. *Id.* at 432–33.

The hearing panel found that Beier violated Rules of Professional Conduct 3.3(a)(1) (Candor Toward the Tribunal) and 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation) in the matter concerning the forged affidavit. *Id.* at 434. In the estate matter, the hearing panel found that he violated Rule 1.5(a) (Fees) by charging an unreasonable fee and by failing to communicate clearly with the client about the method for determining and remitting the fee. *Id.* The hearing panel further found that Beier violated Rule 3.3(a)(1) by stating that his client was the sole heir in his petition; Rule 3.3(a)(3) by failing to inform

the court of the other heirs; Rule 8.4(c) by taking advantage of his client's disability to charge and collect an unreasonable fee; Rule 8.4(c) by failing to include the cousins in the administration of the estate so that he could charge his client an unreasonable fee; and Rule 8.4(a) by violating the other rules. *Id.* The hearing panel identified five aggravating factors: Beier's "dishonest or selfish motive" in both matters, the multiple offenses, his refusal to acknowledge the wrongfulness of his conduct, his estate client's "vulnerability as a victim," and his substantial experience in the practice of law, having practiced for "over forty years, including time as a juvenile and municipal judge." *Id.* at 435. The hearing panel found no mitigating factors. *Id.* It imposed a two-year suspension with three months served as an active suspension and the remainder on probation. *Id.* The Board appealed, and the trial court ordered the entire two-year suspension served as an active suspension. *Id.* Beier appealed to this Court. *Id.*

This Court concluded that substantial and material evidence supported the hearing panel's finding that Beier violated the Rules of Professional Conduct. *Id.* at 438–44. With respect to punishment, we agreed with the hearing panel's application of ABA Standards 5.13, 6.12, and 7.2, which identified reprimand and suspension as the presumptive sanctions for Beier's misconduct in the affidavit matter. *Id.* at 445. But we explained that ABA Standard 7.1, which set the baseline sanction as disbarment, also had to be considered for the more serious violations stemming from Beier's misconduct in the estate matter. *Id.*

We found Beier's misconduct distinguishable from that of the attorney in *Justice* because Beier did not engage in "a pattern of misconduct." *See id.* at 449. We explained that disbarment, the sanction imposed in *Justice*, "is typically reserved for cases that involve a pattern of misconduct or even more serious rule violations than those committed by Mr. Beier." *Id.* We instead found that Beier's misconduct more closely resembled two other cases that imposed two-year suspensions:

> We agree with the chancery court's observation that this case may fairly be compared to *Milligan v. Board of Professional Responsibility*, 166 S.W.3d 665, 674 (Tenn. 2005), and *Napolitano v. Board of Professional Responsibility*, 535 S.W.3d 481 (Tenn. 2017). In *Milligan*, the attorney settled a case without the client's authority; forged signatures on the settlement check and the release document; got an employee to falsely notarize, after the fact, the forged signatures; deposited all of the settlement funds into his personal account; and procured false affidavits to conceal his misconduct. *Milligan*, 166 S.W.3d at 669. The Court imposed a two-year suspension from the practice of law. *Id.* at 674. In *Napolitano*, the Court affirmed a five-year suspension for an attorney who had previously served a five-year suspension, lied under oath, and committed misconduct involving a client's property. *Napolitano*, 535 S.W.3d at 484–87.

*Beier*, 610 S.W.3d at 449. Although Beier's conduct in the estate matter "did not include actual misappropriation of client funds, as in *Milligan*," we viewed "the circumstances under which Beier obtained an unreasonable fee" from his client in the estate matter as "equivalent." *Id.* We emphasized that Beier "took advantage of [his client] as a vulnerable victim, misrepresented to the probate court that [his client] was [his aunt's] sole heir, failed to disclose to the court the existence of the other heirs, and then persuaded the probate court to close the estate without a detailed accounting in order to avoid judicial scrutiny of the fee." *Id.* We agreed with the hearing panel that there were five aggravating factors and no mitigating factors and therefore affirmed the two-year suspension, all to be served as active suspension. *Id.*

While Hickman's conduct bears similarity to Beier's conduct in the estate matter, several differences between Hickman's circumstances and those present in *Beier* persuade us that a lesser sanction is appropriate here. *First*, Hickman's misconduct was limited to a single proceeding. Beier, by contrast, made false representations in two separate proceedings. *Second*, even comparing Hickman's conduct with that of Beier's in the estate matter, Hickman's misconduct was less serious. While both Hickman and Beier exacted an unreasonable fee from the estate and failed to provide an accounting to avoid judicial scrutiny of the fee, Hickman did not take advantage of a vulnerable victim or engage in additional deceitful conduct unrelated to the fee. *Third*, Hickman has two fewer aggravating factors than Beier. And while Beier had no mitigating factors, Hickman has one.

Yet Hickman's misconduct is sufficiently similar to Beier's to warrant an increase in the length of Hickman's period of active suspension. The hearing panel required only ninety days of Hickman's one-year suspension to be served on active suspension. The differences between the circumstances of this case and *Beier* do not justify such a significant disparity in the length of the active suspension. Accordingly, we increase Hickman's period of active suspension from ninety days to six months.

*Indefinite Language in the Judgment*

There is one final issue to consider. The hearing panel's judgment required Hickman to serve "no less than" ninety days active suspension. The judgment left open the possibility that the active suspension could be longer—and the period of probation accordingly shorter—if Hickman failed to engage a practice monitor within ninety days. The judgment also provided that, if Hickman failed to comply with any condition of probation, the suspension would automatically "rever[t] to active suspension for the remainder of the suspension period."

The judgment was flawed in these two respects. Tennessee Supreme Court Rule 9, section 14.1, provides that the "imposition of a suspension for a *fixed* period . . . may be deferred in conjunction with a *fixed* period of probation." (emphasis added). The period of

probation the hearing panel imposed was not fixed. If Hickman failed to engage a practice monitor within ninety days, his active suspension would continue, cutting into his probationary period.[8] Rather than leave Hickman's period of probation open ended, the hearing panel should have ordered a "fixed period of probation" as section 14.1 instructs.

The hearing panel was mistaken that a violation of the conditions of probation would result in "reversion to active suspension." Tennessee Supreme Court Rule 9, section 14.2 outlines the procedure to be followed when an attorney violates a condition of probation. That procedure includes disciplinary counsel filing a petition to revoke probation, notice to the attorney, and an opportunity for the attorney to appear before the hearing panel. Tenn. Sup. Ct. R. 9, § 14.2. Contrary to the hearing panel's view, the period of probation does not automatically revert to active suspension.

## IV. Conclusion

We have closely reviewed the record "with a view to attaining uniformity of punishment throughout the State and appropriateness of punishment under the circumstances." *Id.* § 15.4(b). After considering the nature of Hickman's conduct, applicable ABA Standards, the balance of aggravating and mitigating factors, and cases involving comparable circumstances, we conclude that the judgment of the hearing panel should be modified to impose a one-year suspension, with six months to be served as active suspension. We clarify that the probation period should be fixed rather than indefinite. We affirm all other conditions of probation imposed by the hearing panel but further clarify that violation of one of those conditions does not automatically result in reversion of the period of probation to active suspension. Rather, a violation would trigger the procedure outlined in Tennessee Supreme Court Rule 9, section 14.2. We also order Hickman to comply in all respects with Tennessee Supreme Court Rule 9, especially the obligations and responsibilities of suspended attorneys. Costs of this appeal are taxed to Hickman, for which execution may issue if necessary.

_____
SARAH K. CAMPBELL, JUSTICE

---

[8] When the Board requires an attorney to engage a practice monitor, the attorney must provide the Board with a list of three proposed monitors within fifteen days of entry of the judgment. *See* Tenn. Sup. Ct. R. 9, § 12.9(c). Given this timeline, Hickman's practice monitor almost certainly would have been in place before the end of his period of active suspension.